IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 14, 2018 Session

## STATE OF TENNESSEE v. JOHN STEVEN HERNANDEZ

**Appeal from the Criminal Court for Davidson County**
**No. 2013-C-2028    Steve Dozier, Judge**

_____

### No. M2016-02511-CCA-R3-CD
_____

In 2013, a Davidson County jury convicted the Defendant, John Steven Hernandez, of first degree premeditated murder for a killing that occurred in 1993, for which the trial court imposed a sentence of life in prison. On appeal, the Defendant contends that the trial court erred when it: (1) did not dismiss the charge against him based on pre-indictment delay; (2) did not dismiss the charge against him based on post-indictment delay; (3) denied his motion to suppress evidence; (4) made several erroneous evidentiary rulings; and that (5) the evidence is insufficient to sustain his conviction; and that (6) the Defendant is entitled to a new trial based upon the cumulative effect of the errors. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLEY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Jeffrey A. DeVasher (on appeal), Georgia Sims and Kevin J. Griffith (at trial), Assistant Public Defenders, Nashville, Tennessee; Angela L. Bergman and David R. Esquivel (on appeal), Nashville, Tennessee, for the appellant, John Steven Hernandez.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Stacy L. Rebecca and Pamela Sue Anderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
### I. Facts

This case arises from the murder of Annis Szekely, which occurred in her home in East Nashville on March 7, 1993. On July 23, 2013, a Davison County grand jury

indicted the Defendant, who was the estranged husband of the victim's daughter, for first degree premeditated murder. The Defendant filed an affidavit of indigence and the trial court appointed him counsel.

## A. Pre-Indictment and Post-Indictment Delay

On April 23, 2014, the Defendant entered a plea of not guilty to the charge against him, and the trial court set a hearing for May 22, 2014. On January 21, 2015, the State moved the trial court to reset the case, which at the time of the motion was set for June 8, 2015. On February 6, 2015, the Defendant's attorney informed the trial court the State had requested the case be reset and that the Defendant was "not opposed" to the case being reset. The parties agreed to reset the trial for August 17, 2015.

On August 5, 2015, the Defendant filed a motion seeking a continuance of the trial because his counsel had learned there was DNA evidence remaining from scrapings taken from underneath the victim's fingernails that could be independently tested. The trial court granted the motion and reset the trial for April 4, 2016.

On February 2, 2016, the Defendant filed a *pro se* motion asking the trial court to appoint him as co-counsel because his current counsel had not been responsive. The trial court denied this motion.

On March 30, 2016, the Defendant filed a motion to dismiss the case for speedy trial violation or, in the alternative, be granted a continuance. The Defendant noted there had been a twenty-year delay between the crime and the State's filing of the indictment, which he asserted violated his right to due process. The motion stated further that Defendant's counsel was still unprepared for trial two years after being appointed, so the Defendant would have to give up his right to a speedy trial in order to obtain competent counsel. The motion argued that the pre-indictment delay violated the Defendant's due process right and that the post-indictment delay violated his right to a speedy trial. The State countered that the Defendant had not shown that it had intentionally caused the delay or that he was prejudiced by the delay.

The parties then referenced a motion that the Defendant's counsel ("Counsel"), an assistant public defender, had filed the day before the March 31 hearing. Counsel acknowledged that even though the Defendant's trial was scheduled for the following Monday, she was unsure whether she could be prepared to argue the motion at the present time. Counsel then discussed the pre-indictment and post-indictment delay, saying that she considered herself a State actor for purposes of determining whether the Defendant's speedy trial rights had been violated. She asserted that her unpreparedness should be imputed to the State because she was paid by the State, who did not adequately fund her

2

office. Insufficient funding caused her caseload to be "excessive" and thus she was unable to adequately prepare for the Defendant's trial. She noted the Defendant had waited nine months before being extradited and had endured a three-year delay. She further noted that it had been two years since the Defendant had been arraigned. The Defendant's counsel noted that there had been "delays on both sides," and said that while she had thought she would be prepared for trial, she was not. She further informed the trial court that her unpreparedness put the Defendant in the untenable position of having to either waive his right to a speedy trial or, in the alternative, to represent himself.

The Defendant's counsel asked that the trial court dismiss the indictment or, in the alternative, release the Defendant on his own recognizance. The Defendant's counsel reiterated that it was the Defendant's desire not to continue the case. He wanted to proceed, even if it meant moving forward *pro se* because he had been incarcerated for more than two years. The State said that it was ready to proceed on the set trial date of April 4, 2016.

The trial court set a hearing for April 11, 2016, during which it tasked the parties to present evidence about the pre and post indictment delays.

At the April 11, 2016 hearing, the Defendant's counsel informed the trial court that she was prepared to move forward with presenting proof on the pre-indictment delay but that she needed at least a month to prepare evidence on the post-indictment delay issue.

The Defendant's counsel asked that the trial court appoint outside counsel to litigate the issue of the post-indictment delay. The trial court set a hearing for that particular issue for May 9, 2016, and the hearing then proceeded on the pre-indictment delay issue.

## 1. Pre-Indictment Delay

Glenn Arnold testified that he was an investigator for the Public Defender's office and had investigated this case. He said he had visited the police property room on two occasions, and reviewed and photographed the items displayed to him on both occasions. Mr. Arnold testified that when he first viewed the evidence in January 2015, some of the items were stored in plastic bags with tears or holes in them and that some of the bags were empty. Mr. Arnold agreed that there were a "number" of evidence bags that were torn, ripped, or damaged in some way. He photographed those bags.

Mr. Arnold testified that he saw two test tubes: a human blood sample and a saliva sample. The property tag had a different defendant's name, different incident number,

and different victim's name.  On his second trip to the property room in April 2016, Mr. Arnold noticed some of the evidence had been re-bagged.  He took additional pictures of that evidence.  Mr. Arnold testified that he never encountered anything that was identified as the Defendant's blood.

Mr. Arnold testified that when he viewed the evidence the week before the hearing, the evidence that included a different defendant's name and a different victim's name was no longer included.

Mr. Arnold testified that several of the witnesses in this case were now deceased. One of the witnesses was Dr. Charles Harlan, the medical examiner who conducted the autopsy, and the other was Detective E. J. Bernard, who investigated the case.  He also believed that a civilian witness, Andrew Saicasson, was deceased.

During cross-examination, Mr. Arnold agreed that Mr. Saicasson was one of the victim's sons and that he was not in town when the homicide occurred.  Mr. Arnold agreed that Dr. Harlan's report was contained in the discovery and that another medical examiner could review the doctor's findings and testify about the report.

Mr. Arnold agreed that the victim had been found with her hands tied and bound to a bed with a plastic bag over her head.  While he was unsure whether the items missing from the property room would have been helpful to the defense, he said that it would have been helpful if the defense could have seen the items law enforcement gathered, which included chains, straps, a book called "Slave Mistress," a black mask, a leather mouth part, clamps, hooking tightener, bullets, and a pistol.  Mr. Arnold also agreed that the Defendant's DNA had been taken by swab while he was incarcerated in Texas on an unrelated matter, and sent to Tennessee for testing.  The Defendant's DNA was not taken from a vial of blood contained in evidence.

Amber Elaine Treat, a private investigator, testified that the Public Defender's office hired her to assist in this investigation.  She read the discovery report and investigated potential alibi witnesses.  She recounted that the Defendant said he had been working at Labor Source on March 6 before the murder, so she contacted the owner of Labor Source, Michael Dodson.  She said Mr. Dodson told her he was unable to retrieve the "punch-in, punch-out" records for 1993 because the computer software only kept track of payments made and not the time records of his employees.  He also said he was only required to keep time records for seven years, so the Defendant's time records no longer existed.

Ms. Treat said she listened to an audio recording of an interview with Kalon

4

Radovich, the son of the Defendant's ex-wife, Victoria Ramsey[1], and the grandson of the victim. Mr. Radovich had found the victim's body. Ms. Treat said that the statement was a thirty-seven-minute audio file, but that the audio cut off after the three-minute mark.

Ms. Treat said she traveled to the crime scene in this case. She said the house had been completely "gutted and remodeled." In 1993, the house was a divided duplex, with two families living in the home. At the time of her investigation, the house was a single-family house and the dividing walls had been removed.

During cross-examination, Ms. Treat acknowledged that the State alleged the crime occurred on March 7, not March 6, when the Defendant had said he was working. She said, however, that there were discrepancies in the time frame, and proof the Defendant was working on March 6 would still have aided the defense because they could have argued that the murder actually occurred on March 6 while he was working.

The State called Mike Smith, who testified that he was a detective for Metropolitan Nashville Police Department ("Metro PD") at the time of this crime in 1993, but had since retired. Detective Smith acted as the lead detective in this investigation, working with several other investigators. Detective Smith testified that he was working on March 7, 1993, when he got a call that the victim's body had been found. He went to the scene, where he found present two other detectives, Detectives Mann and Fowler. The detectives had different assignments to document the crime scene. Detectives Mann and Fowler and Sergeants Moore and McElroy all interviewed witnesses and the victim's relatives. Detective Smith said he prepared a report, which he supplemented for the last time on March 30, 1993.

Detective Smith testified that he took evidence from the property room to the Tennessee Bureau of Investigations ("TBI") crime laboratory for testing. Detective Smith reviewed the file and testified that Detective Larry Flare supplemented the file on February 3, 1998; Detective Ray Ellum supplemented the file on August 13, 2001; Detective Terry McElroy, who was deceased at the time of the hearing, supplemented the file on August 14, 2001; and Detective Lee Freeman supplemented the file on February 24, 2006.

During cross-examination, Detective Smith testified that he was involved in executing a search warrant at the Defendant's home on March 8, 1993, at 5:00 a.m. Detective Smith said that he spoke with Victoria Ramsey later that day on the evening of March 8, 1993. He also interviewed several witnesses, including Judy Crabtree on March

---

[1] Ms. Treat called the Defendant's ex-wife "Victoria Hernandez." The Defendant's ex-wife testified later, and gave her name as "Victoria Ramsey." For clarity, we will refer throughout this opinion to the Defendant's ex-wife as "Victoria Ramsey".

11, 1993, and Kevin and Pam Bush on March 15, 1993. Detective Smith said that he had recorded audio from his interview with Ms. Bush. On March 16, 1993, Detective Smith again spoke with Ms. Ramsey. During that interview, Ms. Ramsey said she had spoken with the Defendant about how the victim had died. The detective recalled that Ms. Ramsey had also given him a recording of a phone conversation between Ms. Ramsey and the Defendant.

Detective Smith testified that the investigation notes revealed that on March 23, 1993, Officer Blackwood told him that the fingertip of a latex glove stuck to Scotch tape had been found around the victim's neck. On March 30, Ms. Singleton, the woman with whom the Defendant lived at the time of this offense, called to inform Detective Smith about conversations she had had with the Defendant.

Detective Smith said that he wrote a memo to Lieutenant Jay Cobbs on May 6, 1993, informing the lieutenant that the TBI had determined the DNA sample under the victim's fingernails was too small for testing.

Detective Smith identified a report from 2001, after he had been reassigned to another division, which documented discussion with the Kentucky State Police as to whether Ms. Ramsey would be willing to be wired to speak with the Defendant, who was then in their custody.

During redirect examination by the State, the detective testified that the evidence he brought to the crime laboratory did not provide a physical link between the Defendant and the crime scene.

James Adendall, a detective with the Metro PD cold case unit, testified that his unit reviewed this case in January 2010. He looked at the evidence, reviewed the interviews, and attempted to locate witnesses involved in the case. He also resubmitted some evidence for testing in 2010 and in 2012. Detective Adendall testified that he located the victim's fingernail scrapings and sent them to the Orchid Cellmark forensic laboratory (hereinafter "Cellmark") in Dallas, Texas for testing. The detective said that in 2011, Detective Silfress of the Kentucky State Police informed him that he was working on a case in Kentucky involving the Defendant and that he had DNA from a water bottle used by the Defendant. Also around that time, Detective Adendall sent the clear tape and latex glove evidence to Cellmark for testing. In February 2012, Detective Adendall obtained a search warrant and obtained a sample of the Defendant's DNA by travelling to Texas, where the Defendant was incarcerated on an unrelated case, and executing the warrant for the Defendant's DNA. Detective Adendall then submitted the sample to Cellmark for analysis.

6

Detective Adendall testified that in June 2013, he received results from Cellmark that physically linked the Defendant to the victim's murder, and he presented the case to the Davidson County grand jury. The Defendant was indicted in 2013. The Defendant was extradited from Texas to face charges in Tennessee on April 4, 2014.

During cross-examination, Detective Adendall testified that his unit investigated unsolved cases at least a year old. He agreed that when he received the case file in January 2010, it was well-documented. Detective Adendall agreed the interview with Kaylin Radovich ended abruptly because the recording equipment malfunctioned. He also agreed that many of the interviews were difficult to hear because of the equipment in use at the time.

Detective Adendall said that as part of his investigation, he re-interviewed Shirley Singleton, Victoria Ramsey, and two other witnesses.

Detective Adendall testified that he originally sent items to the TBI to be tested, but the TBI informed him that it did not have the technology to test those items and that they would need to be tested privately. He then contacted Cellmark and sent the items to them for testing. He sent them swabs from the victim, nail clippings, and the Defendant's watch. In September 2010, Ms. Leile at Cellmark advised him that a male's DNA had been found under the victim's fingernails. In October 2010, he learned that law enforcement did not have a known DNA profile for the Defendant. Detective Adendall said he then contacted the Kentucky State Police, who responded in February 2011 saying that they had a DNA profile for the Defendant. Cellmark, however, needed an actual sample from the Defendant, not just the DNA profile, so Detective Adendall met with the Kentucky State Police who gave him a cup and water bottle used by the Defendant. He sent those items to Cellmark in April 2011. In May 2011 Cellmark did testing of the nail clippings and the water bottle and prepared a report.

Detective Adendall said that, in July 2011, he asked Cellmark if they could test the latex glove tip and the clear tape. He received a report on the analysis of these items at the end of October 2011.

The detective said that in January 2012, he reviewed and summarized a taped phone conversation between the Defendant and Ms. Ramsey. Later that month, he sought a search warrant to obtain the Defendant's DNA, who was then in Texas. He went to Texas, collected a buccal swab with the Defendant's DNA and subsequently sent the sample to Cellmark. Ms. Leile emailed him a final report on February 28, 2012. The report included the Defendant as a possible contributor of the DNA found under the victim's fingernails. Shortly thereafter, Detective Adendall gave a copy of this report to Tom Thurman with the District Attorney's Office. On March 14, 2013, the detective

7

received an email from Ms. Leile asking permission to discuss the case with Mr. Thurman. He granted her permission and, in July 2013, forwarded witnesses names and phone numbers to the District Attorney's Office. The Defendant was indicted in June or July 2013.

Detective Adendall testified that in January 2015 he contacted Cellmark to ask if it had returned the evidence to the property room, and discovered the evidence had not yet been returned. At the State's instruction he asked Cellmark to hold the property for potential further testing. In May 2015, he contacted Ms. Leile to inform her that he was sending her buccal swabs from Mr. Radovich, the victim's grandson, for comparison. Cellmark returned the property to the property room in August 2015.

## 2. Post-Indictment Delay

The parties reconvened on May 9, 2016, and presented evidence regarding the post-indictment delay. Counsel informed the trial court that she was still not ready to proceed on the issue of whether the Public Defender's Office's underfunding and understaffing denied the Defendant his right to a speedy trial. She said she was attempting to secure outside counsel to present the issue properly. Counsel argued that, while the trial court could set a trial date, she could not and would not guarantee she would be ready for trial.

The State responded and asked that the Public Defender's Office be removed from the case because they were going to put the case off indefinitely. The State asked the trial court to appoint an attorney that could prepare the case and proceed with a trial. Defense counsel responded that the Defendant was entitled to consistent, effective representation and a speedy trial, which were in conflict by the caseload at the Public Defender's Office.

On May 25, 2016, the parties reconvened and Defendant's counsel informed the trial court that it had likely secured an outside firm to present the issue regarding the post-indictment delay. The State again asked that the Public Defender's Office be removed from the case so that they could set a trial date.

On June 1, 2016, at another hearing, the Defendant's counsel informed the trial court that the law firm of Bass, Berry and Sims had agreed to take the case pro bono for the purpose of presenting evidence about the post-indictment delay. The Defendant's counsel then said that she could be ready for trial before late November 2016. The parties agreed to a hearing date and to a trial date of October 17, 2016. The trial date was later moved to September 19, 2016.

The State expressed concern that, if the trial court allowed the assistant public

8

defender's argument to stand, every public defender could continue a case for long enough to have the case dismissed. The State asked for supplemental discovery to cover eight points so that it could adequately discuss whether a first degree murder indictment should be dismissed because of the workload of the Public Defender's Office. The State opined that the Public Defender's Office should not be successful in their argument when they had not informed the trial court before or since that they could not take additional cases until they resolved some of their pending cases. The State wanted the time records for the attorneys at the Public Defender's Office. Ms. Bergman, the Bass Barry and Sims attorney representing the Defendant on this limited matter (hereinafter "Private Counsel"), posited that the State was not entitled to the time records or any of the other requested information. She further stated that the information relied upon by her expert had been provided as an exhibit.

The trial court asked Private Counsel if the expert had looked at the time sheets of every public defender who had worked on the case during the year-and-one-half that they represented the Defendant. The expert had not viewed their time sheets but had asked the public defenders about their schedules. She said that the expert had not viewed the schedules for paid leave time or vacation leave or the number and nature of out of office activities undertaken by the assistant public defenders during normal office hours. Private Counsel further noted that the State was the opposing party on all cases handled by the Public Defender's Office and could compile its own list of cases.

The trial court asked Private Counsel to have the expert share his notes with the State before the hearing. The trial court ordered the Public Defender's Office to provide the time records related to the Defendant's case and ordered that those be filed under seal.

When the parties reconvened on September 1, 2016, Private Counsel gave opening remarks summarizing the Defendant's position on this matter. She said that he was indicted July 23, 2013, and the case was currently set for trial September 19, 2016. Private Counsel said that during the three-year delay, the Defendant was forced to choose between his constitutional right to a speedy trial and his constitutional right to effective assistance of counsel. Private Counsel opined that the factors considered in determining whether the Defendant's speedy trial rights had been violated weighed in favor of the Defendant. Private Counsel acknowledged that delays requested by defense counsel are generally attributable to the defendant, but that the United States Supreme Court had made an exception to that rule when there is a systemic breakdown of the public defense. Private Counsel said that the Defendant had a good relationship with his public defenders but their workloads inhibited their ability to prepare for his trial. The State disagreed with Private Counsel on each of these arguments, saying that the delay was not unreasonable given the severity of the offense and the fact that the Defendant's counsel asked for many of the delays. The State further posited that there was not a systemic

breakdown of the Public Defender's Office.

Carol Dawn Deaner, the Public Defender for Metro Nashville Davidson County whose mission is to serve citizens of Davison County who have been charged with a crime and cannot afford an attorney, testified that tension existed within her office because her office had more work than they had time to complete. Currently on staff, Ms. Deaner had forty-eight full-time employees, with a forty-ninth position unfilled because there was no funding. Ms. Deaner said that two of her employees were funded by the county and ran an education rights program, so they did not have active caseloads, leaving forty-six employees. Two other employees were "half-time" employees, leaving forty-four and a half attorney positions. She no longer carried a full-active caseload. Ms. Deaner testified that twenty-one of the attorneys in her office had less than five years' experience, which meant they required more supervision and did not have the skills or experience to handle more serious cases.

Ms. Deaner said her office had seven investigators and that they were currently attempting to hire two more investigators to fill vacancies. She said her office also had thirteen legal secretaries and several other paralegal-type support staff, totaling sixteen support staff. Ms. Deaner testified her office did not have sufficient support staff or attorneys to service every client, noting that her office closed 30,000 cases annually. She said there was simply not enough time to provide what she termed "reasonably effective representation" to all clients based upon her office's staffing numbers. Ms. Deaner testified she could not hire more attorneys because she did not have funding, which came from both Metropolitan Government of Nashville, Davidson County ("Metro") government and the State of Tennessee. Ms. Deaner presented evidence showing that the State had funded each of the other districts at significantly increased rates since 1993, but that funding for the 20th judicial district containing the city of Nashville remained relatively "flat," which she opined was contrary to the then-enacted Tennessee Code Annotated section 8-14-210.

Ms. Deaner testified about the actions she took in an attempt to increase her office's funding. In 2012, Ms. Deaner attempted to increase awareness within the Governor's office and the Department of Finance and Administration ("F&A"), as well as the Davidson County delegation to the Legislature, about this issue. She met with David Thurman, the head of F&A, who was the budget director at the time, along with others to inform them that she did not think that they had been "collating our annual increases consistent with the statutory language." She asked for a two million dollar increase, which was the amount that would be equal to the percentage increase in the other judicial districts. Ms. Deaner identified a letter she wrote to Mr. Thurman that explained her calculations and provided numerous documents to support the need for additional funding. As a result, Mr. Thurman and F&A began a study ("Spangenberg

Study") and made a request to Davidson County for additional information.

The Spangenberg Study progressed through the end of 2012 and the beginning of 2013. The Governor's office then issued a short letter characterizing the Public Defender's Office position as an argument that the State's funding for Davidson County Public Defender's Office had not kept pace with inflation. The letter indicated that the Governor's office agreed with this contention and appropriated an additional $500,000 for the Public Defender's office in Davidson County. The letter also recommended a change in the statute. The statute was, in fact, later amended to reflect that the increase or decrease in the Davidson County Public Defender's Office's funding should reflect inflation, a relationship which Ms. Deaner observed had no relevance to her office's caseload.

Ms. Deaner further explained that in addition to her office's funding from the State, it also received funding from Metro. She offered evidence showing the share of her office's budget that Metro had increased over the last twenty-three years. In 1993, half of her office's budget was paid by the State and half was paid by Metro. By 2011, twenty-five percent of her budget was paid by the State and seventy-five percent was paid by Metro. The increased funding from Metro did not, however, make up for stagnant funding from the State. She explained that, by statute, in districts where local governments provided funding for their District Attorney General's Office ("DA's Office"), when the district increased their funding to the DA's office, the district also had to increase the funding to the Public Defender's Office in an amount at least seventy-five percent of the increase to the DA's Office. The statute was designed to "keep equilibrium" between the DA's office and the Public Defender's office.

Ms. Deaner then discussed her office's workload using information from their case management system, JIS. She noted that, in 2014, her office closed 29,617 cases and in 2015, it closed 29,834. The data compiled, however, relied upon human entry from her staff, which she said often fell by the wayside when her staff were "running tight for time." She said the database did a reasonably good job in keeping her office's annual numbers, but she discussed concerns about the accuracy of the tracking of caseloads.

Ms. Deaner testified that the legislature had commissioned a study to determine how many cases any one state attorney could handle, which served as the basis of the Spangenberg Study caseload standards. That study found that no public defender should handle more than 500 misdemeanor cases in a year, if that is the only type of case handled. It further found that a public defender should not handle more than 233 felony cases. She noted, however, that the study was done in 1999, when the practice of criminal defense was significantly different in that there were not nearly as many expert issues. Further, these numbers were the highest in the country. Ms. Deaner said that, on

11

average, in her office the lawyers were handling well more than the Spangenberg Study standards said that they should.

Ms. Deaner testified that the Spangenberg Study found that no public defender should handle more than five first degree murder cases in a year and that, if they had five such cases, they should have no other cases. In 2014, her office closed twenty-two first degree murder cases, meaning that 4.4 of her twenty-two attorneys should have handled only those twenty-two cases. To be in line with the Spangenberg Study, her office would need sixty-seven attorneys, or 22.5 more than the office actually had. Ms. Deaner said that in 2015, her office would have needed 73.8 attorneys, roughly thirty more than she had, to comply with the Spangenberg findings.

Ms. Deaner testified that, while there were no specific strategies she used to help her attorneys handle a caseload beyond the Spangenberg Study guidelines, her office did encourage "meet an[d] plea" practices when applicable. That included resolving a case within a few hours of meeting a client through a plea bargain agreement. Additionally, she encouraged a "tag team" approach in general sessions where the lawyer covering the docket that day would represent any public defender clients facing charges that day. She noted that the impact of this type of representation was that it was in some ways ineffective, because that same lawyer did not follow the case and a new lawyer had to get acquainted with it. It also caused "the ball" to "get[] drop[ped] a lot easier," making it harder to meet performance standards, because there was less time for investigation, to conduct appropriate interviews, or do any legal research.

Ms. Deaner testified that, recently, she had tried to implement some practices to improve their performance standards, such as implementing workload controls and workload caps on the jail docket so that lawyers who were getting new cases each morning were not getting more than ten new misdemeanor cases (class A), more than eight felony cases, or more than six domestic violence cases in any one day. Ms. Deaner said that her office continued to represent every individual charged with a class B or C misdemeanor, except in the cases of conflicts, and this could be an additional fifteen to twenty-five clients per docket. Each case required the attorney to meet with the prosecuting attorney, communicate with the client, convey any offer and discuss legal options and decide how to proceed, and then return to the clerk's office to convey the information. Ms. Deaner said that her attorneys should do more, including interviewing their clients, trying to obtain releases for those individuals if possible, and investigating legal issues.

Ms. Deaner testified that her office began declining cases in 2014 as having a "workload conflict." In the first twelve-month period, her office declined 2,000 cases. Her office declined approximately 2,300 cases the following year in general sessions

12

court alone. She said her office was not keeping track of how many cases it had declined in criminal court on the same basis. In cases her office declined to take, the private bar was responsible for representing the clients, and they were paid $40 per out-of-court hour and $50 per in-court hour, not to exceed $500 per misdemeanor case. These attorneys were not supervised, and there was no oversight to their performance. Ms. Deaner agreed that no one reviewed the private attorney's caseloads.

Ms. Deaner opined that if her office reduced their caseload consistent with the standards, a reduction of 10,000 cases, it would be difficult to find private attorneys to handle that many cases. She further opined that the Administrative Office the Courts ("AOC") could not afford to pay all of those private lawyers their fees.

Ms. Deaner testified that her office was appointed to represent the Defendant in April 2014, and his case was set for trial in September 2016. She agreed that this was a reasonable amount of time to prepare his case and she anticipated that the attorneys representing him would be ready for trial. She said that she had had to restrict them from taking any new cases and to shift their supervisory duties to give them time to prepare.

The trial court asked Ms. Deaner why she did not shift Counsel's duties the first time that the defense attorneys requested a continuance. She acknowledged that it was a good question and one for which she did not have an explanation. Ms. Deaner explained that, when these attorneys were six months out from trial, they probably had every intention of being prepared but got busy. Further, the culture of her office meant that everyone was busy and everyone had a lot of cases so no one attorney wanted to shift their caseload onto another attorney.

Ms. Deaner testified the changes she had to make to the defense attorneys' workloads meant that something for another client was not being done. The Deputy Public Defender, who typically did not handle cases because of her administrative responsibilities, had been doing jail dockets for the two defense attorneys who were primarily responsible for the Defendant's case, Ms. Sims and Mr. Griffith. Further, she suspected that Mr. Griffith and Ms. Sim's other clients were not receiving an appropriate amount of attention. Ms. Deaner said that, in the last three years, her attorneys did not have adequate time to spend with each client. She read from some of the standards expected of defense attorneys, which included meeting with each client, advising them fully about all their rights and options, interacting with their family members, etcetera, and said the attorneys in Nashville Public Defender's office did not have time to meet those standards.

Ms. Deaner opined that a number of the Nashville Public Defender's Office's clients got "reasonably effective representation" consistent with Constitutional

requirements, but that there were clients who did not.

During cross-examination, Ms. Deaner testified that between 1996 and 1997, her summary of her office records showed her office handled 31,645 charges. That number varied slightly but increased to 44,232 charges over the next nine years. When she took office, and shortly thereafter, they began tracking cases and not charges, and cleaned up their database, so she could not say whether her office handled significantly more cases than in 2005. Ms. Deaner said she had never filed a lawsuit against the State or asked Metro to file a lawsuit against the State to address her workload concerns, but she said she had discussed the possibility with the legal department at the mayor's office.

Ms. Deaner agreed that she met with the mayor for the budget for fiscal 2017. She requested funding for eight additional positions, six of which were lawyer positions. She informed the mayor at that meeting that what her office needed most was a data analyst. She agreed she did not inform the mayor that her office needed 29.3 additional attorneys or that her office was having a systemic breakdown. The trial court asked Ms. Deaner why she did not present the issue to the mayor's office, and Ms. Deaner responded that the reason that her office was not meeting standards was because of underfunding by the State, not Metro. Metro exceeded its statutory obligation to her office, so she did not ask Metro for the difference. Additionally, the amount of help her office needed far exceeded what Metro could provide, so she decided to not ask for more.

Ms. Deaner agreed that, as part of implementing her office's workload controls, she sent a letter to the general sessions judges saying assistant public defenders would not accept new clients if the client had not come to her office prior to three days before their court appearance, so her office would have adequate time to prepare. This and other workload controls reduced her office's caseload by about fifty cases per week, or seven percent.

Ms. Deaner agreed that the lawyers in her office could generally come to her with a problem at any time. During her tenure, three assistant public defenders had informed her that they were overloaded. Ms. Sims had never come to her and said she was overloaded. Ms. Sims did not inform Ms. Deaner that the Defendant filed a motion in February to act as co-counsel. Ms. Deaner learned in March or April that the Defendant wanted to go forward with his trial *pro se* regardless of whether his counsel was prepared. After she learned of this, she did not look into the case to see what had been done. Ms. Deaner said she was aware that Ms. Sims had co-counsel, the use of her office's investigator, and the use of a second investigator for whom the trial court had approved funding. Ms. Deaner was unsure whether all the witnesses had been interviewed in preparation of the case. She did, however, take Ms. Sims at her word that she was not ready to proceed with the case.

14

Ms. Deaner testified that Ms. Sims' caseload included four murder cases, eight felony cases, and twenty-two post judgment matters, too many in light of the Spangenberg Study. She stated that an attorney may not be able to handle more than two jury trials in a twenty-month period because it takes just as much time to prepare a case to plea on the morning of trial as it does to try the case, so it was unfair to parse out an adequate caseload for a lawyer based on cases tried. Ms. Deaner agreed that Ms. Sims had twelve open cases and that she had tried one case in 2015 and one case in 2016.

Norman Lefstein, a professor of law and Dean Emeritus of the Indiana School of Law, testified as an expert in the area of public defense services. He offered the opinion that the caseload of the Metro Public Defender's Office in Nashville was extremely high and put the lawyers at risk of failing to provide their clients with competent, timely, and effective representation. Professor Lefstein testified he had reviewed the Spangenberg Study and that the numbers contained therein regarding lawyer caseloads were the highest he had seen anywhere. He said the Spangenberg numbers were 233 felonies or 550 misdemeanors that a lawyer could handle over the course of a rolling twelve-month period. Professor Lefstein felt these numbers were inflated based on an inherently flawed methodology in the study.

Professor Lefstein opined that the lawyers in Ms. Deaner's office would not have time to adequately handle their caseloads. He said further that the forty-four lawyers in the office had seven investigators, which was a six to one ratio. When he worked as a public defender in the past, it was a one to one ratio for lawyers to investigators, in part because prosecutors used the investigative services of the police who gave them the case and defense attorneys had a very different starting position. Professor Lefstein agreed that he thought that there had been a systemic breakdown of the Metro Nashville Public Defender's Office.

During cross-examination, Professor Lefstein testified that he only reviewed the numbers given to him by the lawyers in this case and did not verify those numbers. He also only spoke to the three attorneys involved in this litigation and did not speak with any other public defenders, prosecutors, judges, or clerks, and he never came to court to observe before he formed the opinion that there had been a systemic breakdown of services from the Nashville Public Defender's Office. Professor Lefstein agreed that he was given a list of cases to review, but did not know how many of those were civil habitual motor vehicle offender cases, or general sessions cases, or indigence motions. He also did not ask the attorneys how much time a post-judgment case would take. He further agreed that he did not inspect the timesheet from the Public Defender's Office in Nashville, and had never researched the specifics of the Defendant's case or the representation he received.

15

Professor Lefstein said he did not know how long the Defendant's trial was expected to take, how many motions had been filed in his case, how many witnesses were anticipated, or if there were interns working on the case. He agreed that most public defenders in the office where he had worked handled more than twelve cases at a time. Nevertheless, Professor Lefstein said he was comfortable giving his opinion based on the information that he had reviewed, that he believed the Nashville Public Defender's Office needed to be adequately "resourced," and also that there needed to be private attorneys involved to handle the additional work.

Professor Lefstein clarified that his use of the term "systemic breakdown" did not mean that every single defendant was inadequately represented, but rather that defendants were at constant risk of not being adequately defended. He did not offer a specific number of attorneys needed to adequately staff a public defender's office and said that the study under way should provide more guidance.

Ms. Sims testified that she was an assistant public defender and that she strived to provide the type of representation to her clients that they would receive at a high quality law firm. She said that while she was very proud of some of the work that she had done for some of her clients, she could not do everything necessary for most of her clients. She offered that she provided "effective" representation to most of her clients, but that there were some clients that she did not think that she represented effectively due to her excessive workload.

Ms. Sims said that, before she was assigned to the Defendant's case around 2013[2] she was a "line" public defender in Division I court. Other than her team leader, she was the most experienced on her team, so her caseload tended to be heavier and include more serious felonies. At the time, she did not have any supervisory duties. In 2014, Ms. Sims was promoted to team leader for Division I, and she assumed formal supervisory duties for two other attorneys, which included case assignments, scheduling, and personnel management. She did not reduce her caseload at the time of her promotion, and she estimated that her supervisory duties took about fifteen percent of her time.

Ms. Sims testified that in 2014, she had 157 open cases, which included one murder case, eighty-one felony cases, five misdemeanors, and forty-seven post-judgment matters. This number, she said, did not include any of the cases that carried over from previous fiscal years or that were opened before July 1, 2013. It also did not include any cases for which she sat as second chair. Therefore, she concluded that the number of cases that she had at the time was higher than that figure. In 2015, Ms. Sims opened one

---

[2] It appears that Ms. Sims was actually appointed to represent the Defendant beginning at his arraignment in April 2014.

murder case, thirty-four felony cases, eight misdemeanor cases, 111 post-judgment matters, and 108 general sessions cases. For the same reason, these numbers were also lower than the actual number of cases she had worked on. Further, by the end of 2015, she was supervising five other attorneys, taking upwards of twenty-five percent of her time.

In 2016, Ms. Sims had two additional murder cases, twenty felony cases, two misdemeanor cases, 191 post-judgment matters, and 223 general sessions cases. Ms. Sims testified that, also in 2016, the experience level of the attorneys she supervised dropped significantly, so she had to increase the amount of time she spent formally training and supervising the attorneys on her team.

Ms. Sims said that during the pendency of the Defendant's case she had the same investigator assigned to her. The investigator positions, however, had significant turnover and Ms. Sims's investigator was asked to absorb responsibilities for vacant positions. This caused Ms. Sims to be more hesitant about her investigation requests and she would do some of the investigation herself, leaving less time for actual legal representation work. Ms. Sims estimated that in 2016, she worked between forty and fifty hours per week, not including time that could not be tracked. She still only spent about four hours per client, which she believed was not an adequate amount of time. Ms. Sims said her performance did not meet the attorney's performance standards of her office.

Ms. Sims spoke directly about her representation of the Defendant, which began in April 2014. Ms. Sims agreed the Defendant was indicted in July 2013, but said he was in custody in Texas and there was a lengthy process to extradite him. Ms. Sims said she brought on Mr. Griffith as second chair to split the duties of representing the Defendant evenly. Ms. Sims said that, because of the inadequacy of her investigative staff, very little investigation occurred on the Defendant's case for a "long period of time." She requested funds for an additional outside private investigator from the trial court, which granted her request.

Ms. Sims said that the Defendant's first trial date was in June 2015, but the State had some issues with witnesses being present so, because she was also not ready for trial, Ms. Sims agreed to continue the case. The case was reset for August 2015. At that time, Ms. Sims filed a motion to continue because there was some DNA evidence they had learned was still in existence a few weeks before trial, so she needed time to deal with this late-disclosed evidence. She said that, but for that evidence, she was ready to proceed to trial. The trial was scheduled for April 2016. In February 2016, the Defendant filed a motion asking to be appointed as co-counsel and also asking that his April 2016 trial date not be delayed. Ms. Sims said that between the August 2015 date

when she was prepared for trial and the April 2016 rescheduled trial date, Ms. Sims was unable to prepare for trial because of her workload. At that time, Ms. Sims filed a motion to dismiss for speedy trial violation and in the alternative a motion for a continuance.

Ms. Sims testified that since April of 2016, her workload had shifted so that she could prepare for the Defendant's upcoming trial on September 19. She stopped accepting or assigning herself new cases, instead assigning those cases to her team. She also decreased her appearance on the general sessions docket schedule. Ms. Deaner and the Deputy Public Defender, Ms. Manning, had been required to cover some of the general sessions dockets. Ms. Sims said that she had not done this before because everyone in the office was busy, so it was just a shifting of work, making her colleagues' workload less bearable.

Ms. Sims testified that in the three years since the Defendant's indictment, Dr. Charles Harlan, the medical examiner who performed the autopsy in the case, had passed away. Ms. Sims identified the final order revoking Dr. Harlan's medical license based upon a number of misdeeds that were investigated, which included issues with Dr. Harlan's investigating cases and forming conclusions. Anyone from the medical examiner's office who testified in place of Dr. Harlan could not testify about the facts related to his misconduct and whether that was present in this case.

Ms. Sims detailed ways in which it was difficult for the Defendant to review, maintain, and discuss the evidence in the case against him with his counsel. Ms. Sims reiterated that the primary cause of the Defendant's case being delayed was her workload, and that his representation was the responsibility of the State.

During cross-examination, Ms. Sims testified that she thought she had provided deficient representation to some of her clients. She said she could not answer whether she had offered the Defendant deficient representation because his case had not yet been tried but that, had the case had gone to trial in April, her representation would have been deficient. Ms. Sims said her inability to be prepared for trial in August 2015 represented an ethical lapse by her office toward the Defendant.

Ms. Sims testified that in 2015, she conducted two jury trials: one in Division III, for which she sat second chair and was, therefore, not reflected in her numbers; and the other in Division I. Ms. Sims testified that in 2016, she had tried a rape of a child case only, and that since then, she had not conducted any jury trials. The State then questioned Ms. Sims regarding each week of her work and whether she had a trial scheduled, and she did not have any trials scheduled between January and June of 2016. Ms. Sims noted that she had a first degree murder trial set for August 21, for which she was first chair. Ms. Sims said that, as her affidavit reflected, she had opened twelve cases

18

in criminal court during the fiscal year of 2016. Ms. Sims stated that, because of carry-over cases and the data issue, twelve open cases was not the sum total of her caseload. Ms. Sims could not offer testimony regarding the sum total of her open cases, but she said it was closer to fifteen.

Ms. Sims agreed that several investigators, social workers, and interns from her office visited the Defendant in jail. She agreed that a total of 760 hours had been submitted into the public defender's database as going toward the Defendant's defense.

Ms. Sims agreed that starting in December 2015, she had two investigators working on this case. Ms. Sims agreed the defense did not make a request for personnel or experts to assist the defense. Ms. Sims said the Defendant never asked that she be removed from the case. Further, she had never asked to withdraw from his case. She said, however, the Defendant understood how much work she had done on the case and that he would have to start over again with a new attorney. He was, therefore, making a "calculated and rational decision" to keep Ms. Sims as his attorney but that the choice was not necessarily totally free and voluntary.

Ms. Sims agreed that, at the March 31 hearing on the speedy trial motion, the Defendant said he would be happy to agree to any continuance if he was removed from the care of DCSO and placed in the custody of TDOC, because he believed he would receive better treatment. He did not object to the continuance otherwise, but he was never moved to TDOC custody.

Kevin Griffith testified that he began working at the Public Defender's office in 2010 after he graduated from law school. He felt he was unable to provide the representation that he would like for clients, because of his workload. Mr. Griffith said it was impossible to have the time that he needed for every client on every case. Mr. Griffith said that in the fiscal year 2014, he was assigned fifty-seven felony cases, eleven misdemeanor cases, thirty-six post-judgment matters, and 129 general sessions cases. This, however, did not convey the full number of his cases because the number did not include any cases that were not assigned to him within the computer system or any cases that he opened prior to 2014 that were not settled as of 2014. For example, the Defendant's case was not reflected in his numbers, because he was not the lead attorney, despite the fact that he had spent a significant amount of time on the case.

Mr. Griffith said that, in 2015, he was assigned one murder case, twenty-four felony cases, twelve misdemeanor cases, fifty-three post-judgment matters, and 118 general sessions cases. During that time, while he did not have any formal supervisory duties, he was responsible for maintaining the complicated general sessions schedule. In March 2016, Mr. Griffith was made the team leader of Division V Criminal Court, and

19

his supervisory duties took 15 to 20% of his time. In 2016, he was assigned thirty-five felony cases, six misdemeanor cases, fifty-four post-judgment matters, and 325 general sessions cases. Again, he clarified that this was not an accurate representation of his cases due to inadequacies in office recording of caseload. He noted that the post-judgment matters number was significantly low based on the failure to reassign the case in the database. Mr. Griffith said that, based on the numbers, he had 3.5 hours to spend on each case and that this number could be significantly less depending on the actual number of cases that he carried at any given time, based on cases lasting into another year than the year they were assigned, and cases for which he sat second chair. Mr. Griffith opined that he did not have time to adequately represent each of his clients.

About the Defendant's case, Mr. Griffith said that he and Ms. Sims were not prepared for the August 2015 trial because they did not have time to devote to the case given their large workloads. They further were not prepared in April 2016. Mr. Griffith had three trials between August 2015 and April 2016 and had three other very serious cases that settled within weeks of their scheduled trial, so he had to prepare for trial in all three of those cases. Mr. Griffith said they would be prepared for trial by the current September trial date because the workload had been shifted to other attorneys, putting a strain on their team. Mr. Griffith said that he and Ms. Sims never went to Ms. Deaner with the issue of their inability to be prepared for the trial dates.

Mr. Griffith said that he felt that his workload had prevented him from meeting the performance standards expected of him for each client he represented. He agreed that he had met the standards with respect to some of his clients but not all.

During cross-examination, Mr. Griffith agreed that post-judgment matters assigned to him included probation violations, petitions to declare indigency, and a petition for a suspended sentence, which did not take nearly as much time as a trial. Mr. Griffith testified that he had spent more than an hour on some of these issues but said that they did take significantly less time than other types of cases.

Diana Latiolia, a statistical research analyst with the Metro Nashville criminal justice planning department, testified that her department gathered information upon which to base relevant statistics. She created a report entitled "number of cases by criminal court divisions," which she offered in her testimony. Her information contained the number of defendants represented by the entire Public Defender's Office from 2011 to 2015. She clarified that the report showed the number of cases pending as of a specific day in each of the relevant years.

Ms. Latiolia testified that in 2011, 830 defendants were represented by the Public Defender's Office. In 2012, that number was 907. In 2013, the number of defendants

was 823; in 2014, 893; and in 2015, 700. Ms. Latiolia testified that she looked at the percentage of defendants represented by the Public Defender's Office in each of the criminal court divisions and how that percentage had changed over time. In Division I, the Public Defender's Office represented 54% fewer defendants in 2015 than in 2012.

Ms. Latiolia examined the number of general sessions cases handled by the Public Defender's Office. In 2011 there were 2,622 cases; in 2012, 2,355; in 2013, 2,263; in 2014, 2,025; and in 2015, 2,182. The number of defendants represented by the Public Defender's Office was much fewer, explaining that defendants may face multiple indictments. In 2011 there were 439 defendants; in 2012, 339 defendants; in 2013, 375 defendants; in 2014, 315; and in 2015, 415. These numbers included all pending matters, regardless of the year that the case was initiated.

During cross-examination, Ms. Latiolia agreed that the numbers in the reports were based on entries by the clerk's office and the numbers were dependent on the clerk entering those numbers correctly. She said she had never spoken with the Public Defender's Office about the report or requested search perimeters to ensure the accuracy of the numbers. Ms. Latiolia agreed there were a number of categories not contained in the report, including: community corrections violations; final forfeit; or motions/petitions or review status to report. Ms. Latiolia explained that the report was prepared to include cases that have a pending status and also a future court date. She said she was unable to determine from this information how many cases were closed in any given year. She mentioned there were limitations such as retrial dates of the same defendant, which may cause underreporting of the number of jury trial settings. Based upon this, her office manually looked at the clerk's entries and believed their report was as close to accurate as possible. Mistrials were also not counted in her report, as it only included cases disposed of by trial.

Tom Davis, the Director of Records and Offender Information with the Davidson County Sheriff's Office ("DCSO"), testified and identified the Defendant's visitation history from April 2014 to August 2016. He said that the DCSO tried to accommodate every attorney visit, even if a defendant is in a "[s]pecial management unit." He then identified the Defendant's disciplinary reports, which contained reports of six incidents.

During cross-examination, Mr. Davis testified he had no personal knowledge of whether the visits listed in the visitor log were accurate. He also did not have personal information about the incidents in the disciplinary reports. Mr. Davis also agreed the report did not contain any grievances lodged by the Defendant.

The State offered recordings of the Metro Counsel Budget Hearing for the years 2013 through 2016, the period Ms. Deaner testified about her office. It also offered her

21

testimony for the mayor in fiscal year 2017. Ms. Deaner was recalled and testified that the testimony that she gave was in response to the question of whether the PD's office could function on the amount allotted with the mayor's budget. She agreed that she told the office that in the fiscal year 2015, her office handled in the vicinity of 30,000 cases. She maintained that this number accurately conveyed the status of her office.

Ms. Deaner took issue with the statistics presented by Ms. Latiola. She said the snapshot of those statistics from an arbitrary day in each year in no way offered any insight into how many cases her office closed each year. She said she had not looked at the search parameters but questioned the reliability of information input into CJIS about who the assigned counsel of a case was. She also did not think this data was a good comparison to the data that she had offered. Upon questioning from the trial court, Ms. Deaner agreed that if the Defendant's case was dismissed, her request with the Legislature for more funds potentially held more weight.

Based upon this evidence, and the arguments of counsel, the trial court denied the Defendant's motion by written order, making findings summarized below.

## B. Pretrial Motions
### 1. Motion to Suppress 1993 Search Warrant and Evidence

The Defendant filed a pretrial motion to suppress evidence obtained as the result of the search of his home in 1993, and on appeal maintains the trial court erred in denying that motion. At the hearing on the motion to suppress, the parties presented the following evidence: Mike Smith, a retired detective with the Metropolitan Nashville Police Department (MPD), testified that he was working as a detective in 1993 and was lead investigator in this murder case. He executed a search warrant on March 8, 1993, at the Defendant's home located in Davidson County. Before Clifford Mann, who was another detective working the case, applied for the search warrant, the Defendant spoke with police, giving them a description of clothing he was wearing the day of the murder. During the interview, the Defendant stated that he had received military training on tying specific knots. Detective Mann then filed for a search warrant, the main purpose of which was to search for clothing, and upon the warrant's execution, the detectives found the sought-after clothing.

Detective Smith testified that during the execution of the warrant, the officers also found evidence they believed was relevant to the murder, including items typically used for sexual bondage acts, including ropes. They deemed these potentially relevant because the victim had been found bound with ligature and a plastic bag covering her face. Detective Mann testified that his inventory list was missing a hammer that officers also found at the Defendant's home.

During cross-examination, Detective Smith agreed that officers had spoken with the Defendant's live-in girlfriend at the time, Shirley Singleton. Ms. Singleton told officers the Defendant had washed the clothes the officers were looking for, and that she had hung them to dry. The detective agreed that Ms. Singleton was home when officers executed the search warrant at 5:00 a.m. on March 8, 1993. The detective said his notes indicated the clothing was found on a clothesline in the second bedroom. Officers continued their search and collected several items from the closet of that bedroom, including guns, ammunition, and pornography books on bondage. On a shelf in the same bedroom, officers found a large knife. Detective Smith agreed that, at the time he executed the search warrant, he had no information that the victim had been shot or stabbed, and the search warrant did not include a listing that officers intended to search for weapons.

Detective Smith further agreed that, even after officers had found the clothing they sought, they searched a second bedroom and the closet in that bedroom. Officers found and collected a nylon bag in that closet which contained some bondage items including chains, clasps, locks, and straps. Detective Smith agreed that, at the time, there was no evidence that the victim had been sexually assaulted.

Detective Smith testified that officers collected a hammer, which was listed in a supplemental report. The detective was unsure where the hammer was found. He agreed that the hammer was the only tool he collected from the house. The detective agreed that, as his report indicated officers gathered hair samples from the washing machine, the officers must have searched the washing machine. He had no independent recollection of this.

During redirect examination, Detective Smith testified that, while officers found some clothing on the line in the bedroom, they also looked in the closets because they were not sure exactly what clothing would become relevant. He further stated that officers knew the telephone cords used to bind the victim had been cut with a sharp instrument, such as a knife.

The State then informed the trial court that it was not seeking to introduce the guns or ammunition. They were seeking to introduce the book, which included the term "bondage" in its title, because the victim was bound at the time of her death.

The trial court denied the Defendant's motion to suppress, finding the items additional to the clothing were within plain view.

### 2. Motion to Exclude DNA

The Defendant filed a motion to exclude the DNA evidence obtained pursuant to a search warrant issued in February 2012. He challenged the relevancy of the evidence pursuant to Tennessee Rules of Evidence 401 and 403. The Defendant argued that, while this evidence was circumstantial, it was still subject to rules 401 and 403. The Defendant contended that the prejudice of introducing the DNA evidence from the tape outweighed its probative value because 2,258 of 4,114 individuals in the database could have contributed the DNA on the tape, and 878 of 1,601 Hispanic individuals could have contributed it. That meant that the chance of testing another unrelated male and being able to exclude him as a contributor was only around 45%, and thus over half of the males in this ethnic group were included in the result. The pre-concentrated nail clippings weighed a little more heavily, with a 63% chance that a Hispanic male could be excluded as a contributor. The post-concentrated nail clipping testing increased the percentages of being able to exclude a Hispanic male to 93%, meaning six possible contributors out of 1,600, but the Defendant argued that those calculations did not rise to the level typically seen in DNA calculations.

The State countered that it was relevant that male DNA was found on the tape and under the victim's fingernails, and that the evidence was further relevant because while the type of DNA testing used, Y-STR, may not have the high statistics of other DNA testing it did serve by process of elimination to increase the probability of identification. The weight assigned to such evidence was for the jury to decide. The State further posited that the statistical numbers here were not far from others allowed by courts across Tennessee, and said this evidence was an important "brick" in the "wall" of circumstantial evidence it must build to convict the Defendant.

The trial court denied the motion to suppress the DNA evidence. The findings will be discussed below.

## C. Trial

The case proceeded to trial on September 19, 2016, and the parties presented the following evidence: Kem Kalon Radovich testified that, at the time of the murder, he was fifteen years old and living in a two-bedroom duplex on Woodland Street with his mother, eight-year-old brother, and the victim, who was his grandmother. Mr. Radovich noted that the home was usually unlocked. Mr. Radovich knew the Defendant because the Defendant had previously been married to his mother, and Mr. Radovich still considered the Defendant his stepfather. Mr. Radovich described his relationship with the Defendant as "very good," saying that he still visited the Defendant at his house even after the divorce.

Mr. Radovich recalled the events of the day his grandmother was murdered. Earlier in the day he had been at the home that the Defendant shared with Shirley Singleton, who was the mother of Mr. Radovich's friend Larry Singleton, and with whom the Defendant resided after the divorce. Mr. Radovich said that he and his brother, Joseph, spent the weekend at the Defendant's home but that Ms. Singleton was working that weekend, so she was home very little.

On that Sunday afternoon, Mr. Radovich and his friend Larry had returned to the Defendant's house from a fun house, and the two were playing a game. It began getting dark, so Mr. Radovich decided to return home to finish his homework before school. The Defendant encouraged Mr. Radovich to stay and take the school bus from the Defendant's house the next morning, but Mr. Radovich insisted on making the twenty to thirty-minute walk home because of his homework. Mr. Radovich said that, when he returned home about 5:00 or 6:00 p.m., he noticed the door was locked and he did not have a key. He looked through the window and saw the television was on a channel his grandmother never watched, and the volume was very loud, which he found odd. Mr. Radovich knocked on the door several times and checked all the windows, which he found tightly shut. He went to the nearest gas station where he used a pay phone to call the Defendant and tell him there was something wrong. Mr. Radovich then returned to his house, found a heavy metal jack, and beat down the back door. Upon entering, he found his grandmother lying on the ground with a bag over her head, so Mr. Radovich pulled it off. His grandmother's mouth was open and Mr. Radovich remembered that he started screaming.

Mr. Radovich said he left the house shortly thereafter, incoherent and screaming for help. He did not remember much of what happened until he recalled sitting inside a police car, numb and shaking. Mr. Radovich said his memory from that point was vague, and he was unsure whether the Defendant came to the home.

Mr. Radovich said he knew a man named Nathan Allen Smith, who was a year his senior. Mr. Smith was related to Mr. Radovich's neighbors and came to stay with them infrequently. Mr. Radovich said that he and Mr. Smith sometimes got into trouble together but that he was unaware of any issue between Mr. Smith and the victim.

During cross-examination, Mr. Radovich testified that he could not recall all the statements he had made to police in 1993. He did not recall telling them that, upon his return from the fun house, the Defendant said he had been trying to reach his grandmother by phone and that Mr. Radovich should return home. Mr. Radovich said he did not recall telling detectives that the Defendant told him to call him when he returned home so that the Defendant knew he got home safely.

25

Mr. Radovich said he and the Defendant had a good relationship in 1993, and it was not unusual for Mr. Radovich to spend the weekend with the Defendant. Mr. Radovich said he trusted the Defendant at the time, and he told detectives that the Defendant had never shown signs of violence and would never hurt his grandmother. Mr. Radovich said he was not afraid of the Defendant but "kn[e]w his anger," having seen him get angry many times.

Mr. Radovich said he had not spoken with the Defendant since the murder. He and his mother moved to Wisconsin, where he currently resided.

On redirect examination, Mr. Radovich testified that detectives had swabbed his mouth for testing.

Erin Wilson, a 911 operator, identified an audio recording of the 911 call about the murder. Greta McClain testified that she was a first responder to the call about the murder in this case. When she arrived, the victim's grandson was present and appeared to be crying and possibly in shock. Ms. McClain went into the home where she found the victim tied to the bed. During cross-examination, Ms. McClain said that, shortly after she arrived at 7:32 p.m., several detectives arrived.

EMT Ken Hollis responded to the scene at 7:40 p.m. When he arrived, the victim was in the bedroom lying on the floor, and tied to the bed with a bag over her head. Mr. Hollis said that he and his partner removed the bag and assessed whether the victim could be revived. They also lifted her shirt to attach an EKG and detect any heart activity. These efforts were unsuccessful, as rigor mortis had already set in. Mr. Hollis agreed that there was a student driver with him that evening. He also said the bag over the victim's head was bloody and that he wore latex gloves for the duration of the time he was at the scene.

Tom Jones, a crime scene investigator with the Metro PD, testified that he responded to the crime scene. When he arrived, he first did a walk-through with a video camera recording anything that caught his eye. That video recording was admitted into evidence. Mr. Jones also attempted to lift some latent fingerprints at the scene, including from a telephone. Those fingerprints were submitted to the latent print examiners at the police department. Mr. Jones took some photographs at the scene, including one of a phone cord that had been cut from a phone in the victim's bedroom, and said the cord appeared to have been cut by a sharp instrument.

Mr. Jones identified photographs that he took of the victim's left arm tied with the cut telephone cord to the frame of the hospital bed located in her bedroom. Mr. Jones photographed a knot tied in the cord, and he sent that knot with the victim's body to the

morgue for the autopsy. Mr. Jones subsequently went to the morgue and gathered the victim's clothing and the ligature. While there, he took fingernail scrapings from under the victim's fingernails. Mr. Jones saw a bruise on the back of the victim's left hand and also a ring on that hand.

Charles Ray Blackwood was a crime scene investigator with the Metro PD at the time of these events, and this case was his last full-time assignment. Mr. Blackwood responded to the call in this case and collected and documented evidence at the crime scene. Mr. Blackwood identified photographs that he took of the crime scene, which included pictures of the victim on the floor with a plastic bag over her head, bedding, and a pillow on the floor. He said that a fingernail was broken on the victim's left hand and there was blood under her nail. Mr. Blackwood testified that there was tape on the plastic bag and that, when he removed the tape from the bag, he found what appeared to be a piece of latex glove.

During cross-examination, Mr. Blackwood testified that latent print analysis did not reveal how long a fingerprint had been on a piece of evidence. Mr. Blackwood said that he collected a clump of hair from beneath a splintered floorboard and some hair and fiber around the victim's body. He unsuccessfully searched trash cans and other areas for the murder weapon. He agreed there were other people present at the scene, such as the EMTs who evaluated the victim, and he could not be certain that every one of them wore gloves.

Randall Fowler, a retired Metro PD officer, testified that he was a homicide detective in 1993 and participated in this investigation. He interviewed the Defendant at around 7:00 p.m. while the Defendant was in Detective Fowler's police vehicle, parked at the crime scene. The detective explained that when he arrived at the scene there was a young man present and, shortly thereafter, the Defendant arrived. The young man introduced the Defendant as his stepfather. Detective Fowler took the Defendant to the vehicle to ask him what he might know about the crime. The Defendant explained that the victim was his mother-in-law and that he had seen her last on the day before the homicide, which was a Saturday, when he asked to borrow $20.

The Defendant told the detective that when he came to the victim's home on Saturday at around 6:00 p.m., the victim greeted him. He told her that he wanted money, and he could see that she had packed clothing he had stored at the victim's home. The Defendant said it appeared she wanted him to take the clothing and some papers out of the house. The Defendant said he did not want to take the clothing because he could not carry it along with groceries, and he needed to stop at the grocery store. The Defendant told the detective that he was wearing tennis shoes, blue jeans, and a shirt at the time but that he had fallen in a "mud hole," so he had washed all the clothing and also his shoes.

27

When the detective asked the Defendant where the "mud hole" was located, the Defendant told him it was in an alley.

During cross-examination, Detective Fowler testified that the television was on when he arrived at the victim's home. The first person he spoke with was the victim's grandson, Mr. Radovich, and he then spoke with the Defendant. The detective spoke with Jonathan Brock, a neighbor, and asked if Mr. Brock had seen anything related to the murder. He also asked Mr. Brock his opinion about the Defendant. Mr. Brock told the Detective that his younger brother, Nathan Allen Smith, "hated" the victim. Mr. Brock's mother, Silenda Crosby, was present and confirmed that Mr. Smith hated the victim. Detectives followed up on that lead and learned that Mr. Smith was not in the area at the time of the murder. Detective Fowler testified that he had also interviewed another potential witness, Judy Crabtree, on March 10, 1993, to ask her about this homicide.

Robin Wolf Howard testified she dated Mr. Brock around the time of the murder, and that she lived in a duplex with Mr. Brock and his mother, who were musicians. Ms. Howard said that at the time, she worked at a restaurant. She recalled that their neighbors were the victim, Ms. Ramsey, and Ms. Ramsey's two sons. She knew the Defendant as Ms. Ramsey's husband and said that the Defendant would occasionally come to their home to ask for a ride to different locations.

Ms. Howard recalled that on the day she learned that the victim had been murdered, she was watching Mr. Brock perform with his band. Earlier that day, at around noon or 1:00 p.m., she heard a "bunch of commotion" on the other side of the duplex. She heard a man's voice, which she described as "southern . . . angry . . . [and] [e]xcited." She also heard what sounded like a child's whimper. Ms. Howard said that she did not call the police because there were two male children who lived in the home, so it was not uncommon for there to be a ruckus on that side of the duplex.

When Ms. Howard heard that the victim had been killed, she became emotional because she knew the commotion she had heard was likely surrounding her death. Ms. Howard said that Mr. Smith was a teenager at the time of this murder but was not living with them.

Thomas Simpkins, a retired Metro PD officer, testified that, at the direction of Detective Smith, he went to the Defendant's house on the day of the search and retrieved from police several bags of evidence, including a wooden-handled hammer, clothing including a pair of pants and tennis shoes and a jacket, a hair sample. Officer Simpkins turned those items into the property section.

During cross-examination, Officer Simpkins agreed that the property had been re-

28

bagged over the years. A note on the bags said that the property had been "re[-]bagged due to the deterioration of the brown bags."

During redirect examination, Officer Simpkins testified that he photographed the items before he placed them in bags. He recalled the tennis shoes had been found hanging on a clothesline in one of the bedrooms, along with the pants and other clothing items. He was unsure whether the jacket was also on the clothesline. The officers found the hair samples in the washing machine.

Mike Smith testified that he was a detective for Metro PD assigned to the murder squad at the time of this murder, and acted as lead detective in this case. Several other officers assisted him, some of whom were now deceased. When Detective Smith arrived at the scene, he noted the only sign of forced entry was to the back door. The damage appeared to have been caused by a "bumper jack." The detective identified photographs from the crime scene that depicted how it looked that day. There were photographs of the victim's purse, which included her wallet and approximately $43 in cash. Another photograph showed the victim was wearing a diamond ring on her left hand at the time of her death. Detective Smith did not see anything that appeared to be missing from the home.

Detective Smith testified that Detective Clifford Mann conducted the Defendant's interview and assisted in this investigation. Detective Smith personally executed the search warrant of the Defendant's residence. He asked Officer Simpkins to gather the evidence found during the search.

Detective Smith said that he also interviewed Ms. Ramsey, whom he provided with a tape recorder, which she later returned. Detective Smith also interviewed Ms. Singleton.

During cross-examination, Detective Smith said that no charges were brought against the Defendant in 1993. Detective Smith remained the lead detective until he transferred out of the unit. He agreed that the only suspect that he developed in this case was the Defendant and that he did not investigate anyone else. Detective Smith agreed that there were dishes in the kitchen sink at the time of his initial investigation, but he did not gather those for testing. Detective Smith agreed that damage to the back door was caused by Mr. Radovich, when he gained entry into the home. The detective agreed that there were no other signs of struggle in the home. He found a bag of the Defendant's clothing by the door, and he also found a "beeper." Detective Smith documented several observations of the crime scene, and then he went back to the police department where other officers were already interviewing the Defendant. He joined that interview while it was in progress but did not have much independent recollection of what happened during

29

the interview.  He agreed that, by that time, the Defendant was already a suspect.

Detective Smith agreed that the Defendant told officers what specific clothing he was wearing earlier that day, and the officers found clothing matching that description hanging on a clothesline in the room where he lived.  Detective Smith submitted several requests for examination of pieces of evidence submitted to the TBI.  The detective agreed that much of his investigation included asking each witness about the Defendant.

Detective Smith agreed that he interviewed Mr. Radovich and that they likely attempted to record the interview.  During that interview Mr. Radovich told him that he had been at the Great Escape for most of the day of the murder, and that he had taken a bus home and run into the Defendant and Ms. Singleton on Gallatin Road.  The Defendant sent him home because he had school the next day.  The detective agreed that Mr. Radovich also told him the Defendant said he had been trying to contact the victim during that day, and Ms. Singleton was concerned that the victim had fallen.  Detective Smith agreed that, despite the Defendant being a suspect almost immediately, his house being searched within twelve hours of finding the victim, and witnesses being questioned about him, law enforcement officers still did not charge him with a crime at that time.

On redirect examination, Detective Smith testified that Mr. Radovich's entire statement included that Ms. Singleton told him that she was scared that the victim had fallen on the telephone cord and could not get up.

Jacqueline Cockrill, a civilian employee of the Metro PD crime laboratory, testified as an expert in latent fingerprint examination.  She said she found multiple identifications of the Defendant's fingerprints on the telephone and headset.  There were additional fingerprints taken from the residence that were not attributable to the Defendant.

During cross-examination, Ms. Cockrill agreed that she was not the first person to attempt to compare the latent fingerprints. Ms. Cockrill testified that none of the other latent fingerprints submitted matched the Defendant's fingerprints.

The parties then stipulated that several items gathered from the victim's home and body were turned into the Metro PD evidence and property room and that several pieces of evidence were submitted to the TBI for testing.  Special Agent Floyd Phillips did not find any latent fingerprints on the items submitted.

Bradley Everett, a TBI special agent forensic scientist, testified as an expert in the field of serology and DNA analysis.  He said that one of the reports was from testing done in July 1993 and that it included information such as blood type and whether the

blood present was of human origin. Multiple items were tested, including samples of both the Defendant's and the victim's blood. Agent Everett said that TBI tested scrapings from underneath the Defendant's and the victim's nails and blood spots from items found in the home. Testing was unable to reveal a DNA profile for the contributors and the test results were inconclusive.

During cross-examination, Agent Everett testified his office first began DNA testing in the mid-1990s and then began a more detailed type of testing called PCR-based testing in the late-1990s. His office was not asked to do DNA testing in this case until 2010. He said that the only items that he developed a partial profile from were the clear tape and two blood spots found on the floor. The victim could not be excluded as the contributor to that profile.

Agent Everett testified that he tested a piece of a latex glove tip and he found the victim's DNA on both sides and also a minor contributor on one of the sides. He could not, however, further identify the contributor because there was insufficient DNA for testing.

Huma Nasir testified as an expert in forensic DNA and that she was a senior forensic DNA analyst with Cellmark Forensics at the time the DNA testing involved in this case was performed. She explained the test used in this case, the Y-STR test, saying that it was unique in that it was designed to test for the male DNA only in a sample. The advantage of such a test was that it could target the male DNA in the sample and ignore the female DNA. This helped when dealing with a very small quantity of male DNA. The limitations of this test were that the Y chromosome was not unique to an individual but was passed down from one generation to another. Therefore, the Y chromosome profile would be shared by all of the male's relatives and none of them could be excluded as the contributor. Ms. Nasir said that this type of testing did not become available until around 2000.

Ms. Nasir identified her report dated May 28, 2015, which was her final report and contained all her Y-STR results. Ms. Nasir said that she used half of two swab samples from evidence taken from the victim, returning the other half of both samples to the police department for future testing if necessary. Ms. Nasir said that two independent analysts inputted the evidence into a genetic analyzer. She then personally reviewed all the material and drew her own conclusions.

Ms. Nasir discussed her conclusions, saying that concentrating the sample of DNA taken from underneath the victim's left fingernails resulted in finding seven allele locations. The Defendant's known DNA profile was consistent with each of those allele locations. Because his DNA was consistent with the nail clipping profile, he could not be

excluded as the contributor of the DNA. His male paternal relatives could also not be excluded as the contributor. Ms. Nasir further concluded that the known DNA profile for Mr. Radovich excluded him as the contributor of the DNA found under the victim's fingernails. To offer statistical significance to these numbers, Ms. Nasir testified that the allele locations combination found under the victim's fingernails were seen only six times in 1,601 of the database of men of known Hispanic origin. More specifically, 99.3% of Hispanic men would be excluded as a contributor. Ms. Nasir testified that her testing of the tape indicated the presence of DNA from two, possibly three, different men.

During cross-examination, Ms. Nassir testified that, if during the concentration process there was contamination, then the concentration process would make the contamination appear more pronounced. She further agreed the DNA from the clear tape showed the presence of potentially three male contributors. Ms. Nassir agreed that, based on Mr. Radovich's known Y-STR genetic profile, she could neither include nor exclude Mr. Radovich as the contributor of the DNA found under the victim's left fingernails or on the tape. Ms. Nassir agreed that she did not know the source of the DNA present under the fingernails or on the tape, meaning it could have come from contact, or saliva, or some other transfer.

James Adendall a retired officer with Metro, testified that he was assigned this case in 2010 as a "cold case." After reviewing what had been done when the case was first investigated, he sent some items to be tested at the TBI laboratory. TBI informed him that they did not have the proper equipment to test the evidence, so Officer Arendall forwarded the evidence to Orchid Cellmark for retesting. Officer Arendall said that as part of his investigation he located the Defendant, who declined to voluntarily give him a DNA sample. Officer Arendall obtained a search warrant allowing him to retrieve the Defendant's DNA by buccal swab. He also obtained a sample of Mr. Radovich's DNA by buccal swab and sent both swabs for testing.

During cross-examination, Officer Arendall testified that the Defendant was a suspect when this case was first investigated. He said he wanted to locate some of the witnesses and re-interview them because their recorded interviews were of poor quality. He recalled interviewing Ms. Singleton and said her statement was substantially similar to the statement she gave originally. He also interviewed Ms. Singleton's son, Larry Singleton, Ms. Ramsey, and Robin Wolf. There were some witnesses who had been interviewed in 1993 whom he was unable to locate at the time of his cold case investigation. Officer Arendall agreed that he did not seek DNA testing comparing Mr. Radovich to the male contributor on the DNA submitted in this case until after the Defendant had already been indicted for the murder.

Officer Arendall said he interviewed both Ms. Ramsey and Mr. Radovich in 2012

but his tape recorder did not work at the time, so those interviews were not recorded. He agreed that he did not develop a single new witness or suspect as part of his investigation.

Clifford Mann, a retired officer with Metro PD, testified that he was one of the detectives that investigated this case in 1993. Detective Mann interviewed the Defendant at the police station, and he was the only detective present for the duration of the interview. Detective Mann said he allowed Ms. Singleton to go into the room with the Defendant after the interview, in an attempt to get information from the Defendant. Detective Mann said he took pictures of portions of the Defendant's body, including small scratches or abrasions on his upper shoulder, lower shoulder, and hand. He transported the Defendant to the hospital where they collected the Defendant's fingernail clippings. Detective Mann also confiscated the Defendant's watch, which he turned into evidence.

During cross-examination, Detective Mann testified he had not been involved in this case since March 13, 1993. Detective Mann agreed the Defendant told him the victim and a man named Nathaniel Smith had gotten into an argument at the Super X Drugstore on Gallatin Pike. He said he never interviewed Mr. Smith and made no attempt to investigate this alleged argument. Detective Mann testified he found a witness, Steve Bartlett, who told him he had been working in the neighborhood March 6, 1993, and had seen a white male teenager standing across the street looking at him while appearing distressed. Detective Mann testified that, while he put this information in his report, he made no effort to follow up on that information. The detective agreed he did not ask Ms. Bush to record a telephone conversation with anyone other than the Defendant.

During redirect examination, Detective Mann testified he attempted to locate Mr. Smith in follow up to the Defendant's claim, but he and other officers were unable to do so. Detective Mann said that Mr. Bartlett's claim about a distressed teenager was regarding a different address, so he did not think that it was connected to the victim's murder.

The State then played a video recording of the Defendant's 1993 interview. During the recording, the Defendant offered to help the investigation in any way he could and that he would kill anyone who had murdered the victim. He said he was not a violent person, but he could be when provoked. The Defendant said that he had gone into the army, which had made a "killer" out of him, by teaching him to break necks or use a garrote knot to inflict injury or death.

The Defendant said during his interview that he went to the victim's house after Mr. Radovich called. On his way, he called 911 and asked for police assistance,

assuming that he would need to break in the door when he arrived. Before he arrived, Mr. Radovich kicked in the door. When police arrived, they did not allow him to enter the residence. The Defendant said that someone told him that the victim had a bag over her head and that she had been strangled but that he did not know what had happened.

The Defendant told officers that he had gone to the victim's home earlier in the day, at around 3:00 p.m., but that no one was home when he arrived. He said that on his way back to Ms. Singleton's house, he fell into some mud that was on the shoulder of the sidewalk. At the time he was wearing a Star Trek t-shirt, blue cords, and dark shoes. He told the officers that the shoes he was wearing at the time of the interview were identical to the shoes that he was wearing that day. He washed his clothes because of the mud but also washed his shoes as "an afterthought."

The Defendant said that he had seen the victim the night before at around 6:00 p.m., when he asked her for $20 so he could buy groceries. At that time, the victim told the Defendant she had some mail for him and a "bag" of items that belonged to him. He did not take them with him at the time, and told her that he would come back later and retrieve them, which was part of his intention in stopping by her house on the day she was found murdered.

The Defendant told officers that Mr. Smith had been into an argument with the victim, he had a violent nature, and he had been in trouble before.

Law enforcement officers then allowed Ms. Singleton to enter into the room. She told the Defendant that she let law enforcement officers have his clothing, and he said that was fine. She asked him directly if he had done this, and he said no and that if he ever found out who had done it, he would "kill the bastard." The Defendant repeatedly and adamantly denied that he had any involvement in the crime. The Defendant expressed outrage that someone would get away with this crime because the police were investigating him.

The Defendant offered to give the police his clothing, and he said that police would not find any blood on his clothing. The Defendant expressed distrust and distain for law enforcement and the trial court system.

Detective Mann said that he gave Pam Bush, a family friend, a tape recorder to record the Defendant admitting involvement in this offense. That recording was offered into evidence. In the recording, the Defendant asked Ms. Bush if Ms. Ramsey had ever returned. Ms. Bush said that she had bad dreams the night before. The Defendant said that he had also had an unusual dream about the victim. He said that he witnessed the victim being beaten to death by an assailant. He said that, in his dream, he saw the

34

murder from the point of view of the killer and that the victim told the person who killed her that she forgave them. Then she pulled the Defendant close and uttered a riddle about one end being cut and one end being broken and then mentioned something about a biblical measurement. The Defendant said he thought that maybe the victim was trying to communicate with him from the grave. The Defendant said that he dreamed that he took the hammer away from the assailant and started beating the assailant with it and then the individual changed into the victim, so he was beating the victim.

During further cross-examination after the recording was played, Detective Mann testified that the video was a short excerpt of the time the Defendant spent at the police station. The detective found relevant that the Defendant had been in the Army, and he agreed that he did not make an attempt to verify this information. The detective also did not attempt to verify that the Defendant had fallen into a mud puddle by going to look at the area where he said he fell.

Victoria Ramsey testified that she was the Defendant's ex-wife. The two had married in 1986 and became separated in the summer of 1992. Before they separated, the two lived together with her two sons, Kalon and Joseph. Ms. Ramsey's mother also stayed with them intermittently. After their separation, Ms. Ramsey moved with her two sons into the home of her mother, the victim in this case. Ms. Ramsey recalled that, at the time of this murder, her sons were fifteen and nine, respectively.

Ms. Ramsey recalled that the victim was seventy-two and having difficulty with her knees. Accordingly, Ms. Ramsey had purchased a used hospital bed in order to elevate her mother's legs in anticipation of her having surgery. Ms. Ramsey said her mother received monthly checks from Social Security and a small check from an investment that Ms. Ramsey's father had made for her mother, which paid for the victim's rent.

Ms. Ramsey testified the Defendant never lived in the victim's home and did not have a key to their home. He did, however, have some items in boxes and bags at the residence, as not all of their property had been divided. Ms. Ramsey said that a musician and her two sons and one of her son's girlfriends lived on the other side of the duplex from her mother.

Ms. Ramsey said that on March 4, 1993, she went to Wisconsin in an effort to prepare to move there. She took her youngest son with her. Ms. Ramsey said her separation from the Defendant was "amicable" and that, while Mr. Radovich was staying behind with the victim, it would not have been unusual for him to visit the Defendant, who had been in his life for six years. At the time, the Defendant was living with Shirley Singleton.

Ms. Ramsey recalled that the duplex where the victim lived had locks, and she opined that the victim would not have let the Defendant come visit her while she was alone. Ms. Ramsey said that after learning of the victim's death a day after the murder, she flew home. Upon her return, she spoke with the Defendant whom she asked to take her to find something to bury her mother in. While the two were driving, the Defendant told her about a dream he had had about her mother. He told her that he dreamed that he saw a man with a hammer in his hand beating her mother in the head. He said, in the dream, he walked up to the man, took the hammer, and began beating the man with the hammer. The man then became her mother, and the Defendant was beating her mother in the head with the hammer.

Ms. Ramsey said that she relayed what the Defendant had told her to police, who gave her recording equipment in an attempt to record the Defendant. Ms. Ramsey then identified the voices on a recording of the telephone conversation between Ms. Bush and the Defendant in which the Defendant discussed his dream. She also identified a recording between her and the Defendant in which the Defendant discussed his dream. His recount was similar to the version of the dream that he gave Ms. Bush. The Defendant said that he saw a Caucasian male hitting the victim in with a hammer. In the dream, the Defendant became enraged at the assailant, grabbed him, and spun him around, and then it was almost as if the assailant handed the Defendant the hammer. The Defendant said that he then began beating the assailant with the hammer, and as the assailant's face came into focus, he saw that it was actually the victim that he was beating. He said he felt fear and then calm. The victim motioned him down and whispered a riddle to him.

Ms. Ramsey said that she lived with Ms. Bush for seven months after this murder. Ms. Ramsey clarified that nothing was taken from the home.

Ms. Ramsey identified a picture of the telephone line that was tied with knots and used to bind her mother. She said that, during their marriage, she had seen the Defendant tie knots similar to the ones depicted in the photograph.

During cross-examination, Ms. Ramsey testified that she and the Defendant were married for about six years at the time of the murder, but they had been separated for approximately nine months. She identified her marital dissolution agreement ("MDA") with the Defendant and stated that she and her mother jointly owned some property with the Defendant. The MDA contemplated the parties would divide the nineteen-acre property. The agreement had to be amended upon her mother's death and her mother's interest in the property went to Ms. Ramsey and Ms. Ramsey's brother. Ms. Ramsey agreed that, while she had modified the MDA after her mother's death, she did not

restrict the Defendant's visitation with her two children. She agreed that after her mother's death, she still met with the Defendant and rode in the car alone with him.

Ms. Ramsey agreed that the Defendant's name was on the lease of her mother's home, even though he did not live there. She explained that she and her mother needed the Defendant to co-sign on the lease to meet the income requirements for the rental. Some of the Defendant's things were at the home in boxes by the front door for the Defendant to retrieve at his convenience. The Defendant also visited her sons, so it was not unusual for him to be at the home.

Ms. Ramsey testified she had told police about a light switch that appeared broken near the front door. She said that the switch was not broken before she left to go out of town but that it was broken after her mother's murder. Ms. Ramsey agreed that, while she had spoken with the police, she refused to speak with the Defendant's investigators.

Ms. Singleton testified that she met the Defendant when her son Larry and the Defendant's step-son became friends. The Defendant was, at the time, married to Ms. Ramsey. Ms. Singleton said that at the time of this murder, the Defendant was living with her and her son. Ms. Singleton recalled that on March 7, 1993, the day that the victim was found murdered, she had gone to church. After church, she took a bus to the hospital to visit her mother and then one of her brothers brought her home at around 3:00 p.m. When she got home, she called a friend that had expressed interest in her mother's health.

Ms. Singleton said that while she was on the telephone with her friend, the Defendant came into the house. He waved in greeting to her and then walked away while she remained on the telephone. Ms. Singleton recalled that when she finished her conversation, she saw that the Defendant was sitting at the kitchen table. She noted that the washing machine was running and she had never known him to do laundry before. The Defendant told her that he had fallen and gotten mud on a brand new shirt, so he was laundering it in hopes it would not stain. The Defendant washed his shirt, his pants, and his shoes.

Ms. Singleton said that she noticed that the Defendant had a scrape near his elbow and she asked him how he had hurt his arm. He told her that he hurt it when he fell, and then he went to the bathroom and washed that area of his arm. Ms. Singleton said that the Defendant was not wearing a shirt, and she also noticed that he had some scratches on his back. Ms. Singleton said that she never noticed any mud on the Defendant.

Ms. Singleton said that while it did not immediately occur to her, she recalled that the weather was sunny that day. There was no rain while she waited for her bus to go see

37

her mother. Further, there had not been any rain for several days, so she was unsure where the Defendant found mud.

That afternoon, the Defendant attempted to call the victim. He said he was getting worried because the victim was not answering her phone. Ms. Singleton suggested to the Defendant that, because it was a beautiful day, perhaps the victim was taking a short walk. Ms. Singleton testified that the Defendant wanted a newspaper, so the two of them walked to get a newspaper during which time they ran into Mr. Radovich and Larry Singleton. The four went back to her house and she prepared dinner. After dinner, Ms. Singleton reminded them it was a school day the following day, and the Defendant told Mr. Radovich that he needed to go home.

Shortly after Mr. Radovich left, the Defendant got a telephone call. After the phone call, the Defendant told Ms. Singleton that Mr. Radovich could not get into his house. Ms. Singleton suggested that they call 911 because the victim may have fallen and hurt herself. The Defendant told her not to call 911. The Defendant eventually called 911 and then walked to the victim's house. Before leaving, the Defendant made a comment referring to the victim in the past tense, which Ms. Singleton found odd.

Ms. Singleton said that the police took all of them to the police station. She was, at one point, in a room with the Defendant and asked him what had happened. The Defendant pointed to a tape recorder and then turned the tape recorder off. Police eventually took her home and then later came back and searched her home. They confiscated the Defendant's clothing, a hammer, and several other items. When the Defendant was released by police and returned home, she told him what police had taken. He went to their hallway and looked for his hammer and then said, laughing, "[T]hey took your hammer, they didn't take mine."

Ms. Singleton testified that she asked the Defendant about the scratches on his back, and he told her that he had an itch on his back and that he had used his hammer to scratch the itch.

During cross-examination, Ms. Singleton agreed that when she spoke with police in 1993 she was unsure whether the substance on the Defendant's elbow was mud or blood. She agreed that she was still uncertain whether it was blood or mud. She said that, before they left to get the newspaper, the Defendant took his clothing and shoes out of the washing machine and hung them on an indoor clothesline. She agreed the Defendant asked Mr. Radovich to call him when he got home. When Mr. Radovich called because he could not get into the home, the Defendant said he needed to go there in case something had happened to the victim. Ms. Singleton agreed she had told the police that the scratches on the Defendant's back looked like fingernail scratches.

Ms. Singleton answered some questions regarding when she first arrived at the victim's home after Mr. Radovich had called. She said the police were present when she arrived, and that Mr. Radovich was in the backseat of a police cruiser. Officers let Mr. Radovich go and sit with Ms. Singleton and the Defendant, and the Defendant put his arms around Mr. Radovich's shoulders. Ms. Singleton did not recall any blood on Mr. Radovich's clothing.

Ms. Singleton said that she and the Defendant were taken in separate police cars to the police station, where they were interviewed separately. Officers then placed Ms. Singleton in the same room with the Defendant, in hopes she could get him to talk about what had happened. Eventually, officers took her home while the Defendant remained at the station, and, early the next morning, officers executed a search warrant of her house. The Defendant arrived home later in the morning after the search was complete.

Ms. Singleton agreed that the Defendant never confessed to her that he committed this murder.

Linda Littlejohn, an agent with the TBI crime laboratory, testified as an expert in the field of microanalysis. She said that she examined some of the evidence in this case, including the Defendant's and the victim's clothing. She attempted to catch and analyze any debris she found on the clothing. She found fibers consistent with the victim's clothing on the Defendant's clothing, including his jacket.

During cross-examination, Agent Littlejohn agreed that it was possible to have fiber transfer from a secondary source, meaning that if someone sat in a chair, then left, the next person to sit in the chair could have fibers from the first person's clothing on their own clothing. The agent agreed that the fibers that she found on the Defendant's shoe were not consistent with the victim's clothing. In addition to the fibers consistent with the victim's clothing, Agent Littlejohn also found other fibers on the Defendant's pants. Agent Littlejohn said that none of the fibers on the victim's clothing was consistent with the Defendant's clothing.

Adele Lewis, the Deputy State Chief Medical Examiner for the Tennessee Department of Health, testified as an expert in forensic pathology. Dr. Lewis testified that she did not perform the victim's autopsy, but that Dr. Harlan, who was medical examiner at the time of the victim's death but since had died, performed the autopsy. Dr. Lewis identified Dr. Harlan's report, which the trial court admitted into evidence. Dr. Lewis said she reviewed Dr. Harlan's report, photographs of the victim's injuries, Dr. Harlan's written notes, as well as his diagrams of the victim's injuries. From all this information, Dr. Lewis determined that the victim's cause of death was blunt force

trauma to the head, suffocation by a plastic bag, suffocation by ligature strangulation, and blunt force trauma to the chest. Dr. Lewis identified photographs of the victim's injuries. Dr. Lewis agreed that the victim's injuries were consistent with a hammer. Dr. Lewis testified that the victim had multiple broken ribs on both sides of her body and that her spine had become separated, injuries which in themselves could have caused her death. Her injuries were consistent with either a hammer or a foot. Dr. Lewis said that the victim was in a state of rigor mortis at the time of autopsy, meaning that her death occurred approximately not less than thirty minutes and not more than thirty-six hours before the exam.

During cross-examination, Dr. Lewis conceded that there was no way to recreate Dr. Harlan's actual examination of the victim's body and the resulting report and photographs. Dr. Lewis agreed that in 2005, Dr. Harlan's medical license was revoked by the State of Tennessee. Dr. Lewis agreed that Dr. Harlan listed four causes of death and that she could not say which of those was the actual cause of death. Dr. Lewis agreed that she could not identify what object caused the victim's blunt force trauma. Dr. Lewis agreed that the victim could have died either March 6 or March 7, 1993, according to the findings in Dr. Harlan's report.

Glen Arnold, a criminal investigator with the Public Defender's Office, testified for the defense that he visited the police property room on January 6, 2015 and April 7, 2016. He identified photographs that he took on both occasions. Those photographs supported his testimony that some of the evidence bags related to the case were torn and not resealed. Mr. Arnold noted that, when he viewed the evidence on January 6, 2015 one piece of evidence, the Defendant's pants, had some fibers on the knee area, which he photographed. Mr. Arnold said that, when he returned to reexamine the property on April 7, 2016, some of the evidence had been re-bagged.

Mr. Arnold testified that when he viewed evidence on January 6, there appeared to be samples from a separate case. He saw vials of blood and a vial of saliva that both had a different complaint number from a different year. The biological evidence was missing when he viewed the evidence on April 7.

During cross-examination, Mr. Arnold testified that he did not have a photograph of the biological evidence that had gone missing. He said that he took a photograph of the evidence but that he did not have it with him at trial.

William Watson, a molecular biologist who testified as an expert in forensic DNA analysis and forensic serology, said that the type of testing performed by Cellmark in this case was more susceptible to contamination. He further explained that not all laboratories calculate statistics using the same method. Dr. Watson said he would not

have calculated the statistics the same as Ms. Nassir because of the presence of the additional peak, which indicated that there was an additional contributor. Reviewing the data, Dr. Watson explained that Cellmark only had the equivalent of the amount of DNA that you would find in two cells, or a miniscule amount of DNA to test. The tape had an even smaller amount of DNA to test.

Dr. Watson testified that, even if the DNA under the victim's fingernails came from the Defendant, that evidence only showed the victim's fingernails at some point came into contact with something that had the Defendant's DNA on it. He said studies show that it is not uncommon to find foreign DNA on a person and it is usually contributed by someone with whom they cohabitate.

Dr. Watson testified that the DNA on the tape showed the presence of at least three male contributors. Dr. Watson said it was possible for the DNA to be contaminated without Cellmark knowing, depending on how the crime scene had been processed. The precautions in 1993 for processing a crime scene were not as focused on preventing contamination.

Dr. Watson testified that a person sheds millions of skill cells onto their clothing. If someone else handled their clothing, they may have come into contact with that DNA.

During cross-examination, Dr. Watson testified that Cellmark was an accredited lab and that Y-STR testing was an appropriate technique to use when there was a low quantity of DNA. He said that DNA can be found under someone's fingernails if they scratch another person. Dr. Watson agreed that Ms. Nassir had a more extensive background in Y-STR testing than he did, in addition to more hands-on experience.

Based upon this evidence, the jury found the Defendant guilty of first degree premeditated murder. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it: (1) did not dismiss the charge against him based on pre-indictment delay; (2) did not dismiss the charge against him based on post-indictment delay; (3) denied his motion to suppress evidence; (4) made several erroneous evidentiary rulings; and that, (5) the evidence is insufficient to sustain his conviction; and, (6) he is entitled to a new trial based upon the cumulative effect of the errors.

## A. Pre-Indictment Delay

41

The Defendant contends that the delay of more than twenty years between the commission of the offense and the issuance of the indictment in this case violated his right to due process of law. He asks this court to dismiss his indictment. The State counters that the Defendant is not entitled to relief because he failed to establish either that he was prejudiced by the delay or that the State caused the delay to gain a tactical advantage.

Regarding the pre-indictment delay, the trial court found:

The offense was committed in March 1993. An investigation by Metro Police ensued thereafter. Detective James Arendall from the cold case unit began investigating the crime in 2010 and DNA testing was initiated based on his investigation. The DNA testing identified the Defendant in 2012 as a potential source. The indictment was returned on July 23, 2013.

The Court agrees with the [D]efendant that sufficient delay occurred in this case to trigger due process inquiry. *State v. Carico*, 968 S.W.2d 280 (Tenn. 1998). Indeed, the approximate twenty (20) year delay was lengthy. The Court agrees that the passage of this many years may be prejudicial to the defense, but it also appears to be more disadvantageous to the State in this matter. To show prejudice, the [D]efendant points to the death of the Medical Examiner, Dr. Harlan, the retirement of multiple police officers, neighborhood changes, fading memories, and incomplete recordings. However, no actual prejudice was shown at the hearing, and there is no indication that the tangible evidence, mentioned by the [D]efendant as incomplete, will be admissible at trial. Additionally, the Court finds that the State did not intentionally delay the prosecution in order to obtain a tactical advantage. While there does appear to be gaps in time, the record reflects that the police continued to investigate the crime through the cold case unit and advances in DNA technology eventually proved successful in identifying the [D]efendant as a potential source of DNA found at the scene. However, the DNA sample is somewhat degraded, but a jury will determine the weight to be given to the DNA evidence at trial. Further, utilizing new DNA technology is not delaying to gain a tactical advantage as the defendant contends. Rather, it is a conscientious way for the State to identify a suspect and to avoid arresting someone before the evidence supports that decision.

The Fifth and Fourteenth Amendments to the United States Constitution and article I, section 8 of the Tennessee Constitution provide a criminal defendant with the

right to due process. *State v. Gray*, 919 S.W.2d 668, 671 (Tenn. 1996).

> Before an accused is entitled to relief based upon the delay between the offense and the initiation of adversarial proceedings, the accused must prove that (a) there was a delay, (b) the accused sustained actual prejudice as a direct and proximate result of the delay, and (c) the State caused the delay in order to gain tactical advantage over or to harass the accused.

*State v. Dykes*, 803 S.W.2d 250, 256 (Tenn. Crim. App. 1990); *see State v. Utley*, 956 S.W.2d 489, 495 (Tenn. 1997); *United States v. Marion*, 404 W. S. 307 (1971). Prejudice to a defendant is the most critical factor. *State v. Gilley*, 297 S.W.3d 739, 755 (Tenn. Crim. App. 2008).

The record in this case reflects that the offense occurred on March 6 or March 7, 1993, but the Defendant, who was the sole suspect from the time of the killing, was not indicted for first degree premeditated murder until July 23, 2013. The Defendant has established a lengthy pre-indictment delay that implicates the due process right to a fair trial.

The Defendant must next establish that he sustained actual prejudice as a direct and proximate result of the delay. Relative to prejudice, the Defendant offered that the Chief Medical Examiner who had performed the victim's autopsy had died during the delay. His report was entered through the new medical examiner, but the defense was unable to cross-examine Dr. Harlan about the fact that his medical license had been revoked based on professional transgressions, including misidentifying victims, incorrectly determining the cause of death, and concealing that he contaminated samples. The Defendant said he also would have cross-examined Dr. Harlan about his failure to estimate the victim's time of death and inadequacies in his autopsy report. The Defendant also offered that two police officers involved in the investigation, Detective Bernard and Detective McElroy, had also died between the time of this offense and the Defendant's indictment.

The Defendant further asserts he was prejudiced by the delay because numerous pieces of evidence had disappeared from the Metro PD property room before his indictment. DNA evidence was completely consumed during the delay, and the crime scene was altered when the house in which the murder occurred was completely remodeled. The Defendant asserts the delay resulted in his inability to assert an alibi defense because his employer could no longer provide the Defendant with his work records.

We conclude that the delay did not prejudice the Defendant in this case. His

arguments, while compelling, do not amount to prejudice. Dr. Harlan's report included factual findings, which the Defendant's investigator agreed could be interpreted by the then-sitting medical examiner. The deceased law enforcement officers created reports that did not contradict any of the other officers' reports or testimony. The consumption of the DNA evidence was a result of duplicative testing. There was no evidence the house alterations prejudiced the Defendant and, finally, as to his work records, he admitted that he was not working on March 7, the day this crime almost certainly occurred. The Defendant said that he saw the victim alive at 6:00 p.m. on March 6 when he went to her home and asked her for grocery money. He then said he went to the grocery store and took his groceries home. He made no allegation that, later in the evening after bringing groceries to his home on March 6, he went to work. Accordingly, any work records for earlier in the day, before he says he saw the victim alive at 6:00 p.m., are not relevant to his defense.

In any event, the Defendant has failed to establish that the pre-indictment delay was caused by the State in order to gain tactical advantage over or to harass the Defendant. To the contrary, the evidence implies that the State would not proceed with this case until it had some link between the Defendant and the crime scene. Advancement in DNA technology meant that Cellmark could test the small amount of DNA available under the victim's fingernails and offer evidence that the Defendant was the potential source of that DNA. Months after obtaining the Cellmark report, the State sought and obtained an indictment against the Defendant. We conclude the Defendant has not proven that he is entitled to a dismissal of his indictment based upon pre-indictment delay.

We further note that the Defendant in his brief asks us to abandon the requirement set forth by the United States Supreme Court in *Marion*, 404 U.S. 307 (1971) and the Tennessee Supreme Court in *Dykes*, 803 S.W.2d 250, 255 (Tenn. Crim. App. 1990). He contends the requirement that a defendant show the State caused a delay in order to gain a tactical advantage places a daunting, almost insurmountable burden on the accused. This court is bound by the decisions of the United States and Tennessee Supreme Courts. *Owens v. State*, 13 S.W.3d 742, 764 (Tenn. Crim. App. 1999) (citing *State v. Middlebrooks*, 995 S.W.2d 550 (Tenn. 1999)). We therefore may not overturn settled precedent.

## B. Post-Indictment Delay

The Defendant contends the trial court erred when it denied his motion to dismiss based on a violation of his right to a speedy trial. He asserts the delay in his case, while caused in part by his own attorneys, was attributable to the State because there was a "systemic breakdown" of the Public Defender's Office. The State counters that this was

a complex case, one in which it was appropriate for the Defendant's attorneys to ask for more time. The State asserts that there is no systemic breakdown in the Public Defender's Office and that the delay in the case is attributable to the Defendant.

With regard to the post-indictment delay, the trial court examined the factors relevant to whether a delay over a year violated the Defendant's right to speedy trial. The trial court found:

Length of Delay

In this case, the Court finds the presumptive time period of over one year has passed. The delay has been approximately three years and one month between the time the [D]efendant was indicted to the current date and twenty-nine months since his arraignment. The Court recognizes where a case is simple and relatively easy to prosecute, delay will weigh more heavily against the State because there is less excuse for delay. *Barker v. Wingo*, 407 U.S. at 531. Here, simplicity is not present. This is a complex, cold case with moving parts in terms of witnesses and DNA evidence. However, this factor weighs in the [D]efendant's favor. Therefore, the Court will consider the remaining factors.

Reason for Delay

The [D]efendant contends that the State of Tennessee's affirmative decision to inadequately fund the Metro Nashville Public Defender's Office has created a systemic breakdown, and because of that breakdown the [D]efendant's right to a speedy trial has been violated. Further, the [D]efendant asserts that this delay should be attributed to the State for the lack of funding.

The Court disagrees with this contention. Because "the attorney is the [Defendant's] agent when acting, or failing to act, in furtherance of the litigation," delay caused by the defendant's counsel is also charged against the defendant. *Coleman v. Thompson*, 501 U.S. 722, 753, 111 S. Ct. 2546, 115 L.Ed.2d 640 (1991). The same principle applies whether counsel is privately retained or publicly assigned, for "[o]nce a lawyer has undertaken the representation of an accused, the duties and obligations are the same whether the lawyer is privately retained, appointed, or serving in a legal aid or defender program." *Polk County v. Dodson*, 454 U.S. 312, 318, 102 S. Ct. 445, 70 L.Ed.2d 509 (1981). "Except for the source of payment," the relationship between a defendant and the public defender representing him is "identical to that existing between any other lawyer and client." *Ibid*. Unlike a prosecutor or the court, assigned counsel ordinarily is not

45

considered a state actor. *Polk County v. Dodson*, 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981).

However, the general rule attributing to the defendant delay caused by assigned counsel is not absolute. Delay resulting from a systemic "breakdown in the public defender system," 955 A.2d, at 1111, could be charged to the State. *Cf. Polk County*, 454 U.S., at 324-325, 102 S. Ct. 445. Although the United States Supreme Court did not define the term "systemic breakdown" in *Vermont v. Brillon*, 556 U.S. 81, 94 (2009), in which the [D]efendant so heavily relies, this Court need not determine its definition today. Delays caused by defense counsel are properly attributed to the defendant, even where counsel is assigned. *Id.* Further, "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case." *Barker v. Wingo*, 407 U.S. 514, 522 (1972).

In the Court's opinion, the facts and details of this particular case are where the inquiry should be focused and where the decision properly rests. According to both Georgia Sims and Kevin Griffith, they have not rendered defective or unethical representation in every case. Kevin Griffith even stated that he has done a fantastic job for some clients. Therefore, this Court must look to the facts in this particular case to determine whether the [D]efendant's rights have been violated and not solely on the overall office problems. Notwithstanding that inquiry, after review of the Spangenberg study, affidavits detailing caseload information from the attorneys in the Metropolitan Davidson County Public Defender's Office, caseload information submitted by the State, and the testimony from the attorneys and Professor Lefstein, a legitimate question has been raised as to whether the Metropolitan Davidson County Public Defender's Office is understaffed and or underfunded based on the sheer volume of cases.[2] However, this Court is not in a position to make that determination nor is it necessary in this matter. What the Court can affirmatively say is that the underfunding of the Metropolitan Davidson County Public Defender's Office is not the culprit of this delay and did not lead to the violation of the [D]efendant's right to a speedy trial.

> FN2 Both the caseload statistics submitted by the Metropolitan Davidson County Public Defender's Office and the State have inaccuracies or deficiencies. The caseload information from the public defender's office does not account for cases that were assigned in the prior fiscal year that are still pending or cases wherein an attorney acts as

"second chair."  The caseload statistics from the State, while they do show pending cases assigned to the public defender including those from prior years, the data only shows a snapshot of cases assigned to the public defender on a single day and not the entire year.  Both compilations also rely on humans to input the correct data into each system so the element of human error is present.

From the record in this case, the trial has been delayed due to multiple continuances acquiesced in or requested by the [D]efendant and for his benefit.  The [D]efendant was indicted on July 23, 2013.  Georgia Sims was appointed to represent the [D]efendant on the date the [D]efendant was arraigned in April 2014.  From the beginning, she worked with Kevin Griffith because he could split the workload with her evenly.  A jury trial was set by agreement in June 2015.  The [D]efendant did not request a trial sooner than that.  Nothing was filed to object to the trial date.  The [D]efendant did not object to the State's request for a two (2) month continuance to August 2015.  In August 2015, the [D]efendant requested a continuance in light of newly discovered evidence.  After the August continuance, [Ms. Sims] requested funds for another investigator.  This request was approved and supplemental requests for funding were also approved by the Court . . . .  The State and defense counsel picked a trial date eight (8) months later.  The Court was not made aware of any objections.  There was nothing filed to indicate an objection.  The first speedy trial motion was filed at the end March 2016.  In April 2016, the [D]efendant said he would agree to a continuance if he was let out of custody.  The [D]efendant did not object to the August or April continuances in court.  The [D]efendant never told the Court that he did not want the public defenders as his lawyers.  Mrs. Sims never told or asked the Court to be relieved, and the [D]efendant declined new representation.  The trial was continued until September 19, 2016, and defense counsel assured the Court they will be ready for trial.

This is a complex, cold case, a homicide.  It is not uncommon for a murder trial to be continued multiple times especially one that is twenty years old.  Georgia Sims and Kevin Griffith were appointed and it appears from their time log they went to work as diligent attorneys would and as any client would request of their attorney. (Exhibit 4, Reported Time for 2014-CC-869).  To date, the attorneys have logged seven hundred sixty hours and twenty-two minutes working on this case. (Exhibit 4, Reported Time for 2014-CC-869).[3]  Both Professor Lefstein and Georgia Sims

47

emphasized the lack of resources available, specifically the lack of investigators in the public defender's office, but there are two investigators assigned specifically to this case: 1) Glen Arnold from the public defender's office; and 2) Amber Treat from A-K Investigations.

> FN3 This record does not appear to include the time spent by Amber Treat investigating this matter. Based on the Court's orders granting funding for this Investigation, it appears to be a significant amount of time. It also may not include jail visits and any unlogged or untracked time.

In addition, Professor Lefstein did not provide a test to aid the Court in determining whether the time spent by the attorneys in this case was sufficient and appropriate. However, based on the proof before the Court, even if the office is experiencing symptoms of a breakdown, there is not one present in this matter.

The [D]efendant cites *New Mexico v. Stock*, 140 N.M. 676 (2006), among others, in support of his position. However, this case involved a defendant whose counsel failed to pursue the issue of his competency and there was a complete lack of attention to the case by both the State and defense counsel. Here, the [D]efendant is competent and acquiesced and or requested the continuances. Additionally, these continuances were for his benefit. Both the State and defense counsel have pursued this case diligently. There was not a complete lack of attention, rather the opposite.

This case required time to properly investigate, prepare, and eventually litigate. Considering the life of this case, the reasons for the delay weigh against the [D]efendant and must be attributed to the [D]efendant and not the State. A contrary conclusion by this Court could encourage appointed counsel to delay proceedings by seeking unreasonable continuances, hoping thereby to obtain a dismissal of the indictment on speedy-trial grounds. *Vermont v. Brillon*, 556 U.S. 81, 93 (2009).

Assertion of Right

In February 2016, the [D]efendant filed a motion to be appointed co-counsel and to proceed with trial in April. In March 2016, Mrs. Sims, on the [D]efendant's behalf, filed motion to dismiss or in the alternative to continue the trial. The motion to dismiss before the Court is the [D]efendant's first assertion of his right to a speedy trial.[4] It was brought to the Court's attention in March 2016. The transcript of that hearing

indicates the [D]efendant understood the continuance request and acquiesced in that request. (Exhibit 12, p. 21) This factor weighs in favor of the State.

> FN4 If the assertion was made sooner, counsel could have apprised the Court of the issues and new private counsel could have been appointed in this matter.

Prejudice

Finally, the Court must consider the prejudice to the [D]efendant caused by the delay. To show prejudice, the [D]efendant points to the death of the Medical Examiner, Dr. Harlan, the retirement of multiple police officers, neighborhood changes, fading memories, and incomplete recordings. However, no specific proof of prejudice and how it negatively impacts the [D]efendant was presented at the hearings. In addition, these continuances have allowed this complex murder case to be properly investigated and prepared for trial. Therefore, the [D]efendant has failed to establish prejudice.

Conclusion

Based upon the foregoing analysis and in consideration of all of the speedy trial factors, the [D]efendant's motions are denied, and the Court will allow this case to proceed to trial on September 19, 2016.

"The right to a speedy trial arises under the Sixth Amendment to the constitution of the United States made applicable to the State by the Fourteenth Amendment . . . and Article 1, § 9 of the Constitution of Tennessee . . . ." *State v. Bishop*, 493 S.W.2d 81, 83 (Tenn. 1973). The right to a speedy trial is "amorphous," "slippery," and "necessarily relative." *Barker v. Wingo*, 407 U.S. 514, 522 (1972). "'The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances.'" *Id.* at 522 (quoting *Beavers v. Haubert*, 198 U.S. 77, 87 (1905). In *Barker*, the United States Supreme Court established that courts should engage in a "balancing test, in which the conduct of both the prosecution and the defendant are weighed." *Id.* at 529. Some of the factors a court should weigh include "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.*

We review a trial court's determination of whether a defendant's right to a speedy trial was violated under an abuse of discretion standard. *State v. Hudgins*, 188 S.W.3d 663, 667 (Tenn. Crim. App. 2005); *State v. Easterly*, 77 S.W.3d 226, 236 (Tenn. Crim. App. 2001). Our review includes evaluating claims of a speedy trial violation by considering the four-part balancing test set forth in *Barker v. Wingo*. *See State v. Bishop*,

493 S.W.2d 81, 83-85 (Tenn. 1977) (adopting the *Barker* analysis in Tennessee). The *Barker* factors are: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) the prejudice to the defendant because of the delay. *Barker*, 407 U.S. at 530; *State v. Simmons*, 54 S.W.3d 755, 758-59 (Tenn. 2001).

## 1. Length of Delay

The first factor we must consider is the length of delay. The length of delay is both the threshold question in the speedy trial analysis and a factor to be weighed with the other three *Barker* factors. *State v. Wood*, 924 S.W.2d 342, 347 (Tenn. 1996) (utilizing the balancing analysis to determine that a thirteen-year delay in trial did not violate the defendant's right to a speedy trial). "'Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.'" *State v. Baker*, 614 S.W.2d 352, 355 (Tenn. 1981) (quoting *Barker*, 407 U.S. at 530). The reasonableness of the length of the delay depends on the complexity of the case. *Barker*, 407 U.S. at 530. "[T]he presumption that the delay has prejudiced the defendant intensifies over time." *Simmons*, 54 S.W.3d at 759.

The trial court weighed this factor in favor of the Defendant. The Defendant was indicted on July 23, 2013, and he was tried on September 19 - 23, 2016. While this delay of three years and two months, as the Defendant concedes, "can be tolerated for a more complex case," a category into which this case clearly falls, this length of delay is sufficient to trigger the speedy trial analysis. This period of delay is not necessarily unreasonable compared to other cases. *See Id.; compare Wood*, 924 S.W.2d at 346 (thirteen-year delay); *Doggett*, 505 U.S. at 653 (six-year delay). We weigh this factor slightly in favor of the Defendant.

## 2. Reason for the Delay

The reason for the delay generally falls into one of four categories: (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense. *Wood*, 924 S.W.2d at 346-47 (applying *Barker*). In this case, the defense team, consisting of government-appointed counsel, caused or acquiesced to several of the delays, placing this case into the fourth category.

In *Vermont v. Brillon*, 556 U.S. 81 (2009), the United States Supreme Court interpreted the *Barker* opinion discussing the reason for the length of delay in the context of government-appointed counsel. The Court first instructed that "'[I]n applying *Barker*,

50

we have asked "whether the government or the criminal defendant is more to blame for the delay.'" *Brillon*, 556 at 90 (quoting *Doggett v. United States*, 505 U.S. 647, 651 (1992). The Court stated that delay caused by the defense weighs against the defendant: "[I]f delay is attributable to the defendant, then his waiver may be given effect under the standard waiver doctrine." *Id.* (citing *Barker*, 407 U.S. at 529). Importantly, this rule ensures that defendants do not employ delay as a "defense tactic" because delays may work to the accused's favor in that witnesses may become unavailable or their memories may fade. *Id.* The attorney representing the defendant is the defendant's agent when acting or failing to act in furtherance of the litigation, and delay caused by the defendant's counsel is also charged against the defendant. *Id.* This rule applies whether defense counsel is privately retained or publicly appointed. *Id.* The Court pointed out, however, that this rule is not absolute. *Id.* at 94. Delay resulting from a "systemic 'breakdown in the public defender system' . . . could be charged to the State." *Id.* (quoting *Vermont v. Brillion*, 955 A.2d 1108, 1111 (Vt. 2008)

The Court in *Brillon* did not expound on what qualified as a "systemic breakdown" in the public defender's office. It, however, found that the three-year delay in trial, during which time six different attorneys represented Mr. Brillon, did not show that Mr. Brillon was denied his constitutional right to a speedy trial. *Brillon*, 556 U.S. at 94 (weighing Mr. Brillon's disruptive behavior heavily against him).

In 2013, the United States Supreme Court initially granted *certiorari* in a case squarely on point to address "[w]hether a state's failure to fund counsel for an indigent defendant for five years, particularly where failure was the direct result of the prosecution's choice to seek the death penalty, should be weighed against the state for speedy trial purposes." *Boyer v. Louisiana*, 569 U.S. 1702 (mem) (2013). The court ultimately dismissed the writ as "improvidently granted" in a *per curiam* order. In the order the Court stated:

> A State's failure to provide adequate funding for an indigent's defense that prevents a case from going to trial is no different than [delay resulting from a systemic breakdown in the public defender system and can be charged to the State]. Where a State has failed to provide funding for the defense and that lack of funding causes a delay, the defendant cannot reasonably be faulted. *See Barker*, 407 U.S. at 531. Placing the consequences of such a delay squarely on the State's shoulder is proper for the simple reason that an indigent defendant has no control over whether a State has set aside funds to pay his lawyer or fund any necessary investigation. The failure to fund an indigent's defense is not as serious as a deliberate effort by the State to cause the delay. But States routinely make tradeoffs in the allocation of limited resources, and it is reasonable

51

that a State bear the consequences of these choices.

*Id.* 569 U.S. at 246 (citation omitted).

Other courts have attempted to interpret the "systemic breakdown" phrase in *Brillon* when faced with the inquiry of whether a defense counsel's actions were imputable to the State based upon a systemic breakdown in the public defender's office. One such case, *Weis v. State*, 694 S.E.2d 350, 355 (2010), *cert denied Weis v. Georgia*, 562 U.S. 850 (2010), discussed this issue in context of a three-and-one-half-year delay between the defendant's arrest and placement of his case on a trial calendar. That court held:

> Thus, although there were funding issues that had contributed to the delay up to the point of November 26, 2007 hearing, the "public defender system" had not broken down from the lack of funding at that point, as there were attorneys available within the public defender system to continue the case. Indeed, there can be no "systemic breakdown in the public defender system" . . . when there are still attorneys within that system who are available to represent the criminal defendant.

*Id. Accord Phan v. State*, 723 S.E.2d 876, 882-83 (2012).

In *People v. Superior Court (Vasquez)*, 27 Cal. App. 5th 36 (Cal. App. Nov. 30, 2018), the California appellate court addressed whether a seventeen-year delay violated a defendant's right to a speedy trial where the defendant was confined for that period of time. The court concluded that two to three years of that delay was caused by a "systemic breakdown in the public defender system" and, considering that, along with the oppressive nature of his confinement for 17 years, his limited ability to assert his right to a speedy trial, and the presumptively prejudicial seventeen-year delay, the trial court did not err when it dismissed the indictment against him. *Id.*

The Supreme Court of New Mexico attempted to interpret this phrase in 2017. *State v. Ochoa*, 406 P.3d 505, 514 (N.M. 2017). In that case the court noted that other courts, like *Weis* quoted above, have interpreted "systemic breakdown in the public defender system" to describe problems that are not only institutional in origin, but sufficiently serious to justify weighing the delay against the government. *Ocha*, 406 P.2d at 514 (quoting *Weis*, 694 S.E.2d at 354-55 for the proposition that funding problems did not amount to a breakdown of the entire public defender system when "lack of funding . . . was not the sole factor contributing to the delay) and *United States v. Young*, 657 F.3d 408, 414-15 (6th Cir. 2011), which rejected the argument that the district court's untimeliness was a "systemic failure" that should weigh against the State). The *Ochoa*

court went on to hold that a government furlough, which impacted one day of a three-day jury trial and resulted in an additional two months, of a total two-year, delay was not the type of "systemic breakdown" contemplated by the *Brillon* Court. (citing also *State v. Brown*, 871 N.W.2d 867 (Wi. 2015) (a non-precedential case concluding that there was no systemic breakdown when its public defender department left an unlicensed attorney on a case for a short period of the delay).

Other cases have examined the phrase "systemic breakdown" in the public defender's office. *Castellanos v. State*, 366 P.3d 1279, 1301 (WY. 2016) (finding no systemic breakdown when there was a 927-day delay, 357 days of which the defendant was assigned counsel who was not qualified to try a capital case); *State v. Redlich*, 321 P.3d 82, 146 (Mt. 2014) (holding that a delay of 485 days between the defendant's arrest and trial did not violate his constitutional rights to a speedy trial even though it was caused, in part by turnover at the Office of the Public Defender).

In *State v. Ollivier*, 312 P.3d 1, 14 (Wash. 2013), the Washington Supreme Court found that a twenty-three-month delay did not violate the Defendant's right to a speedy trial, even though he objected to some of the continuances sought by his defense counsel. In so doing, the court stated:

Many courts hold that even where continuances are sought over the defendant's objection, delay caused by the defendant's counsel is charged against the defendant under the *Barker* balancing test if the continuances were sought in order to provide professional assistance in the defendant's interests. *E.g., Bergman v. Cates*, No. EDCV 12-00339-AG, 2012 WL 5328717 (C.D. Cal. Aug. 10, 2012) (unpublished); *Cox v. Warden*, No. 1:10-cv-117, 2011 WL 1980169, at *5 (S.D. Ohio Apr. 26, 2011) (unpublished); *State v. Ward*, 227 Kan. 663, 667, 608 P.2d 1351 (1980) (defendant objected to continuances and argued that timing of trial was a decision that must be left to the defendant; court disagreed, saying that "[t]he matter of preparation and date of the trial and the type of defense relied upon are clearly strategical and tactical decisions which require trained professional skill and judgment which must rest with the lawyer"; no violation of Sixth Amendment right to a speedy trial); *Taylor v. State*, 557 So.2d 138, 141-42 (Fla. Dist. Ct. App. 1990) (noting tension between the right to speedy trial and the constitutional right to competent, prepared counsel; finding no violation of the constitutional right to speedy trial where counsel sought a continuance over defendant's objections), *overruled on other grounds by Heuss v. State*, 687 So.2d 823 (Fla. 1996); *State v. Taylor*, 298 S.W.3d 482 (Mo. 2009) (counsel obtained continuances over objection of defendant to prepare for trial; lengthy delay;

defendant effectively asserted constitutional right to speedy trial; no violation of Sixth Amendment); *see also United States v. Brown*, 498 F.3d 523, 531 (6th Cir. 2007) (delays resulting from defense counsel's need to prepare are attributable to the defendant); *People v. Lomax*, 49 Cal.4th 530, 556, 234 P.3d 377, 112 Cal. Rptr. 3d 96 (2010) (when defendant refuses to waive time despite attorney's need for time to more prepare, conflict between statutory and constitutional rights to a speedy trial and Sixth Amendment right to competent, adequately prepared counsel arises; thus, when counsel seeks reasonable time to prepare and delay is for the defendant's benefit, a continuance over the defendant's objection is justified).

*Id.*

We begin our analysis with the principle that whether the Defendant's due process rights were violated because he did not receive a speedy trial is dependent on the facts and circumstances of each individual case. The attorneys representing the Defendant in this case testified that they provided excellent representation for some of their clients but others "fell through the cracks." Ms. Sims, as she should be, was very proud of some of the work that she had done, and Mr. Griffith felt he had done a fantastic job for some of his clients. We cannot overstate our respect for the representation provided by the Nashville Public Defender and those in her office in the face of their heavy caseloads. That said, our inquiry is not one based on whether the Nashville Public Defender's Office should receive additional funding. In this case, our inquiry is limited to whether lack of funding led to a "systemic breakdown" of the Public Defender's Office in this case, so as to warrant a dismissal of the indictment against this Defendant.

The evidence presented shows the Defendant had consistent counsel from the time of his arraignment until his trial. There were also two investigators assigned to his case, and, at defense counsels' request, additional funding was provided by the trial court for the second investigator. Defense counsel and one of the investigators logged at least 760 hours of time on the Defendant's case, and that time did not include the time spent by the second investigator, whom the trial court said logged a "significant" amount of time on the case.

The public defenders offered evidence regarding their caseloads, other supervisory duties, and desire for more positions to better represent the multitude of clients that they serve. While their requests seem reasonable in light of that evidence, it also appears that they have performed well under the budget constraints in which they find themselves. While the courts of Tennessee have never defined the term "systemic breakdown" in this context, we find no evidence that the Davidson County Public Defender's Office had any

54

breakdown in this case, even with their funding constraints, and to the contrary provided competent, thorough representation for the Defendant.

The record shows that the Defendant was arraigned on April 23, 2015, and his first trial was set for June 2015. At the June 2015 setting, some of the State's witnesses were not present and by Ms. Sims' testimony the defense was not ready for trial, so the Defendant agreed to continue the case until August 2015. This two-month delay is slightly more attributable to the State. Both parties were prepared to proceed at the August trial date, but Ms. Sims said that she learned that there might be remaining DNA evidence that she could have tested. She asked for a continuance in order to research this issue and funds for another investigator, and the trial court granted both requests. The trial was reset for April 2016. This continuance was in the Defendant's best interest, so that eight-month portion of the delay is attributable to him. Within this period, however, the Defendant filed a motion to be appointed as co-counsel in February 2016 and a motion to dismiss based upon speedy trial violation in March 2016. Ms. Sims informed the trial court in April 2016 that she was unprepared for trial because of her workload, and the trial court reset the case for September 1, 2016. During that time, the trial court heard evidence on the speedy trial motion regarding both pre and post indictment delays. According to Ms. Sims, in April 2016, the Public Defender shifted Ms. Sims and Mr. Griffith's caseloads to others, so that they could be prepared for trial and provide adequate representation to the Defendant. By September, she was by all accounts fully prepared and extremely effective during the trial, as was her co-counsel Mr. Griffith.

The need and justification for additional funding aside, the Public Defender's Office in this case operated in accordance with how an effective Public Defender's Office operates. Once the Defendant's attorneys expressed their inability to provide the Defendant's case enough time, their caseloads were shifted so that they could adequately prepare for his trial. The other members of the Public Defender's Office were able to, and did, accept the additional caseload to provide the Defendant's attorneys with adequate time to prepare. Had Ms. Sims expressed her needs earlier, presumably these same actions could have been taken. We must separate the issue of whether the office is adequately resourced from the issue of whether there was a "systemic breakdown" of that office based on a lack of resources. In this case, and very likely because of the commitment of all of the attorneys in the Public Defender's Office, we conclude that the thirty-eight month delay was not caused by a "systemic" or any other "breakdown" of the Public Defender's Office. Therefore, the delay, which was requested or acquiesced to by the Defendant in or for his benefit, is attributable to the defense and the principal of waiver applies. This factor weighs in favor of the State.

### 3. Assertion of the Right

55

This third *Barker* factor requires us to determine whether and if so when, the Defendant asserted his right to a speedy trial. In February 2016, the Defendant filed a motion to be appointed as co-counsel. In March 2016, the Defendant's counsel, on the Defendant's behalf filed a motion to dismiss, which was his first mention to the trial court that he was asserting his right to a speedy trial. This was two years after he was arraigned and after his counsel had requested an eight-month delay, along with an additional investigator for the Defendant's benefit. At a hearing on the speedy trial motion, which occurred during the eight-month delay requested by the Defendant's counsel for investigation, the Defendant complained of being incarcerated by the DCSO and asked to be transferred to TDOC. He agreed to a continuance until September, asking that he be relocated. While the record shows he was ultimately not relocated, it also shows that he did understand and agree to the continuance. The failure of the Defendant to make an assertion of the right during the two years after his arraignment but during a continuance that was requested for his own benefit weighs in the State's favor. Further, the fact that the Defendant agreed to a continuance in the hearing on his speedy trial motion also weighs in favor of the State.

### 4. Prejudice

Finally, we must determine whether the Defendant was prejudiced by the delay, which is the "final and most important factor in the [speedy trial] analysis." *Simmons*, 54 S.W.3d at 760. Prejudice is to be assessed in light of the following interests of the accused which the right to a speedy trial was designed to protect: (1) to prevent undue and oppressive incarceration prior to trial; (2) to minimize the anxiety and concern that results from being accused of a crime; and (3) to limit the risk that the defense will be impaired. *Id*. Our supreme court has held that "the most important issue concerning prejudice to the defendant is the impairment of the ability to prepare a defense." *State v. Berry*, 141 S.W.3d 549, 568 (Tenn. 2004) (citing *State v. Baker*, 614 S.W.2d 352, 356 (Tenn. 1981)).

The Defendant contends that he was prejudiced by this delay in several regards. As we previously determined, the two-month delay is attributable to the State but the second, eight-month delay based on DNA evidence is attributable to the Defendant. The third continuance, based upon the workload of the defense and the need to hear the motions regarding pre and post-indictment delay is neutral, in that the trial court had to hear and appoint outside counsel to present arguments based upon the Defendant's filings. During this period, the public defender's office shifted the Defendant's defense counsels' workload to ensure they were prepared for trial.

The Defendant notes that over time, there were problems with the evidence in the property room and that his work records became unavailable. These problems were not a

result of the portion of the delay of trial attributable to the State. While the property room evidence was allegedly discovered in 2015, there was no evidence of what evidence exactly was missing and how it would have aided the Defendant. In fact, the work records issue was one that was a result of the pre-indictment delay, as mentioned above. It is not a result of post-indictment delay. The Defendant also notes that the medical examiner died on October 2, 1993. This occurred before the Defendant was arraigned in April 2014 and did not occur during the period of post-indictment delay. We have addressed the legality of the pre-indictment delay in response to the Defendant's contention that he is entitled to dismissal of his charges based upon pre-indictment delay. We, therefore, only address whether the Defendant suffered any prejudice from the delay between the time of his indictment and his trial.

The Defendant notes that time spent incarcerated is inherently prejudicial, and we agree. He notes that his incarceration was oppressive in that he was not able to meet with his attorneys, his defense materials were destroyed, and he could not use the law library. There is equal evidence that some of these results may have been based upon his behavior while incarcerated.

It is important to note that some delay in the Defendant's trial was for his benefit and to investigate evidence and facts that may have aided in his defense. Further, much of the prejudice to which he points did not occur within the period that his trial was delayed. Finally, anxiety and concern are "always present to some extent, and thus absent some unusual showing [are] not likely to be determinative in [a] defendant's favor." 5 WAYNE LAFAVE, CRIMINAL PROCEDURE, § 18.2(e) (4th ed. 2017) (footnotes omitted). The Defendant's pretrial incarceration, while inherently detrimental, does not establish prejudice when weighed against the portion of delay attributable to the Defendant, the severity of the charges, and the complexity of the case.

In balancing the aforementioned factors, we conclude that the Defendant's right to a speedy trial was not violated. Accordingly, the Defendant is not entitled to relief on this issue.

### C. Motion to Suppress
### 1. 1993 Search Warrant

The Defendant contends that the trial court erred when it denied his motion to suppress evidence against him. He asserts that law enforcement officers seized items not listed in the search warrant including a knife, shotgun, revolver, ammunition, pornography books on bondage, a nylon bag containing bondage items, a jacket, and a hammer, some of which were seized from inside a closet. Before trial, the Defendant filed a motion to suppress some of these items contending that they were obtained outside

the scope of the warrant. The trial court denied this motion, finding:

> The evidence in this case indicates the items Detective Smith and others observed were in plain view. Officers entered into the residence with a valid search warrant. The search warrant approved the entire search of the house. Officers had the right to be in the position to view the items. They were searching for clothes listed in the warrant. It is reasonable to think clothes would be found in the closet. The [D]efendant contends that Ms. Singleton showed officers the clothing listed in the warrant so there was no need to search the closet. The [D]efendant also argued that the clothes hanging on the line inside the home were found first, so there was no need to enter the closet. However, there was no testimony or proof presented to substantiate those arguments at the hearing. Further, at the time, which was early in the investigation, Detective Smith knew that the victim suffered trauma and was beaten in the head in this offense, and the victim was bound to a bed with a cord that had been cut. Therefore, the officers were well within the plain view exception when they seized the knife, which could have been used to cut the cord, and the hammer, which could have been used to beat the victim and to cause the trauma. Based upon the information known to detectives, the incriminating nature of these items were readily apparent. Therefore, the Court concludes the officers properly seized the items observed in the residence pursuant to the plain view doctrine.
>
> In regard to the other items mentioned in the motion, the State is not seeking to introduce the guns, ammunition, washer, nylon bag, or hair sample. These items will be excluded by the State. As to the pornography book that mentions "bondage" and the bondage items found in the nylon bag, the Court will determine their relevance and admissibility as the Court hears more proof and context at trial, so the Court can properly weigh the probative value and prejudice as required.

During the trial, the State offered as exhibits from the search warrant: the Defendant's clothes and a hair sample, which the Defendant does not contest. The State also offered a hammer and allowed testimony that officers had found a knife in the Defendant's residence when they executed the search warrant. The Defendant does contest the admission of the hammer and the evidence regarding the knife. The State counters that the hammer and the knife were in plain view, when the officers were searching for clothes, and were, therefore, found pursuant to the "in plain view" doctrine as the officers properly executed the search warrant.

A defendant seeking to suppress evidence obtained pursuant to a search warrant bears the burden of establishing by a preponderance of the evidence "the existence of a constitutional or statutory defect in the search warrant or the search conducted pursuant to the warrant." *State v. Henning*, 975 S.W.2d 290, 298 (Tenn. 1998). Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *Henning*, 975 S.W.2d at 299.

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, and "'Article 1, Section 7 [of the Tennessee Constitution] is identical in intent and purpose with the Fourth Amendment.'" *State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting *Sneed v. State*, 423 S.W.2d 857, 860 (Tenn. 1968)). Under the Fourth Amendment a search warrant must contain a particular description of the items to be seized. *See Marron v. United States*, 275 U.S. 192 (1927). Likewise, Article I, Section 7 of the Tennessee Constitution prohibits general warrants, and, in addition Tennessee Code Annotated section 40-6-103), specifically requires that search warrants describe the property to be seized with particularity. *Hampton v. State*, 148 Tenn. 155, 252 S.W. 1007 (1923).

Under both the Tennessee and United States Constitutions, no search warrant may be issued except upon probable cause, which "requires reasonable grounds for suspicion, supported by circumstances indicative of an illegal act." *State v. Smotherman*, 201 S.W.3d 657, 662 (Tenn. 2006). Tennessee requires a written and sworn affidavit, "containing allegations from which the magistrate can determine whether probable cause exists," as "an indispensable prerequisite to the issuance of a search warrant." *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998). The affidavit must contain more than mere conclusory allegations on the part of the affiant. *Id*. Thus, the affidavit must "set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched." *State v. Smith*, 868 S.W.2d 561, 572 (Tenn. 1993) (citations omitted).

"The nexus between the place to be searched and the items to be seized may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence." *Smith*, 868 S.W.2d at 572 (citation omitted); *see also State v. Saine*, 297 S.W.3d 199, 206 (Tenn. 2009) (recognizing that an affidavit in support of a search warrant "must show a nexus among the criminal activity, the place to be searched, and the items to be seized") (citing *State v. Reid*, 91 S.W.3d 247, 273 (Tenn. 2002); Smith, 868 S.W.2d at 572)).

In the case under submission, the affidavit in support of the search warrant issued stated:

> Considering the totality of the circumstances described herein, your affiant would, therefore, pray that a search warrant be issued for [the Defendant's house] and that officers with the Metropolitan Police Department make a search of the home in order to find and locate certain articles of clothing and shoes worn by the said [Defendant] during his visit to the home of the deceased on Sunday the 7th of March, 1993 described by [the Defendant] as: a pair of black corduroy trousers, a Star Trek pull over T-shirt and a pair of black tennis shoes with Velcro straps, and inspect said articles for evidence linking [the Defendant] to the crime scene and said articles brought before this court as provided by law.

This court has previously stated:

> The rule that general searches are unwarranted does not prevent the executing officer, having a search warrant describing property and being lawfully on the premises, from seizing other property he discovers being used in the commission of crime, for after a lawful entry on the premises through a search warrant, the question of whether or not an officer can make an added seizure depends upon its reasonableness. *Robertson v. State*, 188 Tenn. 471, 221 S.W.2d 520.

*Jones v. State*, 523 S.W.2d 942, 946 (Tenn. Crim. App. 1975). We have also said, "Once the officers were properly inside the apartment, they acted lawfully in observing incriminating or highly suspicious evidence which was in plain view, *State v. Byerley*, 635 S.W.2d 511 (Tenn. 1982), including a semi-automatic weapon." *See State v. Barr*, No. 89-267-III, 1990 WL 75108, at *3 (Tenn. Crim. App., at Nashville, June 8, 1990), (also stating "As to whether the officers went outside the scope of the search warrant in removing from the appellant's apartment items other than those items noted in the search warrant and affidavit, an officer is justified in seizing any object which he reasonably believes to be contraband, which is in plain view in a location that he is searching

60

pursuant to a search warrant" citing *Jones*, 523 S.W.2d at 946), *perm. app. denied* (Oct. 8, 1990). Finally, "There is no prohibition against the seizure of other property not specifically mentioned in a valid search warrant, if such is relevant to the crimes suggested by the warrant." *State v. Dellinger*, 79 S.W.3d 458, 471-72 (Tenn. 2002) (citing *State v. Wright*, 618 S.W.2d 310, 318 (Tenn. Crim. App. 1981)).

In this case, Detective Smith testified at the suppression hearing that when officers were executing the warrant, Ms. Singleton told them where to find the clothing that the Defendant had washed and dried. After officers had found the clothing hanging to dry, they continued to search a closet where they found the hammer. We think this is reasonable. Officers had gone to the Defendant's residence to search for his clothing and shoes. While Ms. Singleton had told them that some clothing was hanging to dry, officers would have been remiss if they failed to search and find similar or identical clothing or shoes that contained incriminating evidence in the closets. As Detective Smith explained, he was unsure exactly what clothing would become relevant. The warrant contemplated the officers finding clothing, and they searched in a closet. This search did not exceed the scope of the warrant, whether or not there was similar clothing hanging to dry in another room. Further, once they were lawfully searching the closet, it was reasonable that they confiscate a knife, which could have been used to cut the cord found binding the victim.

As to the hammer, we conclude that the trial court did not abuse its discretion when it found that the hammer was in plain view while the officers were validly executing a search warrant. There is no evidence in the record about where it was found other than an inventory list that states that the hammer was found in the "front room." We further agree that the incriminating evidence of the hammer was readily apparent as the victim suffered blunt force trauma. The Defendant is not entitled to relief on this issue.

### 2. 2012 Search Warrant DNA Evidence

The Defendant next contends that the trial court erred when it denied his motion to suppress his saliva sample obtained by law enforcement pursuant to a search warrant issued in February 2012 and which was executed upon him while he was incarcerated in Texas. He asserted in the trial court that the seizure of his saliva was not supported by probable cause. On appeal he contends that the affidavit supporting the warrant did not establish probable cause because it did not "allege any criminal conduct by him" and that the witnesses, even if presumed reliable, provided information consistent with the Defendant's innocence. The State counters that the affidavit provides probable cause for the trial court to have issued the warrant. We agree with the State.

61

After hearing the motion to suppress, the trial court found:

> The Court finds the information contained in the affidavit clearly recites information that came from citizen informants: Shirley Singleton; Pam Bush; and Victoria Hernandez. The affidavit lists Shirley Singleton as the defendant John's roommate. It lists Pam Bush as a friend of John's ex-wife, Victoria Hernandez, and it lists Victoria Hernandez as [the Defendant's] ex-wife. It also contains statements against interest made by the [D]efendant. These informants were known to the affiant, Detective Arendall, and listed in the affidavit. Further, the Texas affidavit completed by Detective Faithful was attached, incorporated, and contained Detective Arendall's information detailing his professional information and involvement. Considering the entirety of both affidavits and read in a commonsense and practical manner, the Court finds the information to be reliable. Relying on this information, the magistrate in this matter was equipped with a substantial basis for concluding that a search warrant for the [D]efendant's DNA would uncover evidence of wrongdoing.

It is well-settled that the obtaining a DNA sample is subject to constitutional limitations imposed by the Fourth Amendment. *See State v. Scarborough*, 201 S.W.3d 607, 616 (Tenn. 2006). Under the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution search warrants may not be issued unless a neutral and detached magistrate determines that probable cause exists for their issuance. *Illinois v. Gates*, 462 U.S. 213, 240 (1983); *Henning*, 975 S.W.2d at 294; "'Articulating precisely what probable cause means is not possible.'" *State v. Reynolds*, 504 S.W.3d 283, 300 (Tenn. 2016). "Probable cause is more than a mere suspicion but less than absolute certainty." *Id.* (internal citations and quotation marks omitted; *See also State v. Tuttle*, 515 S.W.3d 282, 301 (Tenn. 2017). "[T]he strength of the evidence necessary to establish probable cause . . . is significantly less than the strength of evidence necessary to find a defendant guilty beyond a reasonable doubt." *State v. Bishop*, 431 S.W.3d 22, 41 (Tenn. 2014). "These [probabilities] are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175 (1949); *see also Reynolds*, 504 S.W.3d at 300 (recognizing that the probable cause standard is practical and nontechnical).

"Determinations of probable cause are extremely fact-dependent." *Tuttle*, 515 S.W.3d at 301 (citations omitted). Reviewing courts afford "great deference" to a magistrate's determination that probable cause exists. *Id.* (citing *Jacumin*, 778 S.W.2d at 431-32 and *State v. Saine*, 297 S.W.3d 199, 207 (Tenn. 2009) (reiterating that appellate courts should afford deference to a magistrate's determination)). "[I]n a doubtful or marginal case a

search under a warrant may be sustainable where without one it would fall." *United States v. Ventresca*, 380 U.S. 102, 106 (1965).

> The point of the Fourth Amendment . . . is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

*Ventresca*, 380 U.S. at 106 (quoting *Johnson v. United States*, 333 U.S. 10, 13-14 (1948)).

In the affidavit supporting the search warrant, Detective James Arendall swore that he believed that a specific criminal offense has been committed, to wit: Murder; in that, on or about the 7th day of March 1993, in Davidson County Tennessee, a person or person(s) unknown did intentionally and knowingly cause the death of Annis Szekely, w/f, 10-20-1922, by blunt force trauma to her head. He also stated:

> I believe that there are items located at or on the person of John Hernandez, h/m, born 08-09-1956, constituting evidence of the above, stated offense or that a particular person committed that offense and are thereby subject to seizure under the laws of Texas and described as follows: John Hernandez H/M. born 08-09-1956.
>
> Human Deoxyribo Nucleic Acid (DNA) of John Hernandez,
>
> Fingernail scrapings were collected from the victim, Annis Szekely, and were submitted for analysis to a private DNA forensic lab, Orchid Cellmark, Dallas, Texas. Two profiles were developed, one was the Annis Szekely, and the second profile was that of an unknown male subject. The samples requested from John Hernandez . . . born 08-09-1956, constitute evidence which could be used to compare with the samples collected from the deceased's fingernails.
>
> On 03-07-1993 around 1915 hours Miss Annis Szekely was found murdered in her home by her 16 year old grandson Kahn Radovich. The victim was tied to a hospital bed with a telephone cord. She had severe trauma to her head and a plastic bag was tied over her head. The victim also had ligature marks on her neck.
>
> John Hernandez was developed as a suspect due to statements he made

while talking to friends of his (John's) ex-wife, Victoria Hernandez and police detectives.

John stated in an interview with police detectives that on 03-07-1993 around 1400 hours he went by the victim's house to check on her. John stated that he did not get an answer at the door.

Shirley Singleton, John's roommate, stated to detectives that on 03-07-1993 around 1530 hours she had just got home from visiting her mother at Baptist Hospital. Miss Singleton stated that John came in about 15 minutes later, said hello, and went into the kitchen where he put his clothes in the washer and turned it on. Shirley stated that John was dressed in a black 'Star Trek' "tee" shirt, black or navy corduroy pants, and black canvas type shoes with Velcro straps. Shirley stated that the washing of the clothes was unusual because John usually just put his clothes on the floor. Shirley stated while the clothes were washing John told Shirley that he fell in a mud puddle on the way home from the victim's house. Shirley also stated that when John came in she did not notice any mud on his clothes. Shirley stated that while they were sitting at the table talking she noticed what appeared to be blood on John's arm. Shirley stated that John got up and went to the bathroom and wiped the blood off. When John retuned he showed Shirley a small abrasion on his arm. John stated it must have happened when he fell.

On 03-15-1993 detectives interviewed Pam Bush who is a friend of Victoria Hernandez (John's ex-wife.) During this interview Bush told of a conversation she had with Hernandez. During the conversation with Pam Bush, John stated he had a dream that he was watching the suspect beating the victim to death with a hammer. (The victim's injuries were consistent with being beat with a hammer). John stated he could not see the suspect[']s face because it was blurry. John stated that the victim then pulled him closer to her and stated to him she forgave them and whispered a riddle to him and a biblical verse. John stated that he could not remember the content of what she said. John stated again during the conversation that he took the hammer away from the suspect and started hitting the suspect with the hammer. John stated as this was happening the suspect changed in to the victim.

On 03-16-93 around 1040 hours Victoria, John's (ex wife), was at Pam Bush's house. Victoria stated that she talked with John on the telephone and he: stated the same story about having a dream about the victim being

64

beaten by a suspect with a hammer. Victoria audio taped that conversation and gave the tape to police detectives. John also stated to Victoria that he had some scratches on his back and this happened because he was scratching his back with a tee ruler.

On 03-30-93 Shirley Singleton stated in an interview with police detectives that John told her that he got the scratches on his back from a hammer he used to scratch his back with. Shirley also stated that John told her that the police took the wrong hammer. John stated to Shirley they took the victim's hammer not his.

In 2010 the victim's finger nail scrapings were sent for DNA testing and a partial profile was developed. Two profiles were developed, one was the victim's, and the second profile was-of an unknown male, subject.

Having reviewed the evidence provided in the affidavit, we conclude that the magistrate had probable cause to issue the search warrant for the Defendant's DNA. The affidavit lays out that the Defendant, by his own admission, went to the victim's home on the day of the murder to check on her. He said she did not answer, so he then went back home, and immediately washed his clothing and shoes. Ms. Singleton saw what appeared to be blood on his arm, and the Defendant told her that his clothing and shoes were dirtied and the scrape must have all come from falling into a mud puddle. Later, the Defendant told two separate witnesses about a dream in which the victim was murdered by a suspect beating her with a hammer. He told Ms. Singleton that the police confiscated the "wrong" hammer. Police took fingernail scrapings from underneath the victim's fingernails and DNA testing showed two profiles: one male and the other the victims. This evidence was sufficient to sustain a finding of probable cause so as to issue a search warrant.

## D. Evidentiary Rulings

The Defendant next contends that the trial court erred when it made several evidentiary rulings. He contends that the trial court erred when it allowed into evidence: (1) the admission of recorded statements the Defendant made about a dream he had regarding the victim's murder; (2) unredacted portions of his interview with police in which he discussed having been trained by the military; and (3) Ms. Ramsey's testimony that she had seen him tie knots similar to the ones used to bind the victim. The State offers responses to each argument, as discussed below.

Admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of

65

discretion. *See State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004) (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)). A trial court's exercise of discretion will not be reversed on appeal unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997). When determining admissibility, a trial court must first decide if the evidence is relevant. Tenn. R. Evid. 402 ("All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible."); *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002). Evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant evidence. Tenn. R. Evid. 401. After a court concludes evidence is relevant, the court must then weigh the probative value of the evidence against the danger the evidence will unfairly prejudice the defendant at trial. Relevant evidence should be excluded if the court determines that the probative value of the evidence "is substantially outweighed by its danger of unfair prejudice." Tenn. R. Evid. 403. The Tennessee Supreme Court has previously emphasized:

> Rule 403 is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence. Excluding relevant evidence under this rule is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion.

*James*, 81 S.W.3d at 757–58 (internal quotations and citations omitted).

### 1. Admission of Statements About Defendant's Dream

The Defendant contends that the trial court erred when it failed to exclude any evidence of a dream that he allegedly had about the victim's death, because it was not relevant and because any probative value it had was far outweighed by the prejudicial effect of the evidence. The State counters that the evidence of the Defendant's dream is probative of his identity as the murderer and also that the probative value is not outweighed by the prejudicial effect.

The evidence presented at trial about the dream included a recorded phone conversation between Ms. Bush and the Defendant during which the Defendant recounts to her a dream where he was present when the victim was beaten with a hammer and, at some one point during the dream, where he became the assailant and beat the victim with the hammer himself. Ms. Ramsey testified to a similar conversation, saying that, while

66

the two were driving, the Defendant told her about a dream he had about the victim. He told her that he dreamed that he saw a man with a hammer in his hand beating the victim in the head. He said, in the dream, he walked up to the man, took the hammer, and began beating the man with the hammer. Then the man he was beating became the victim and he was beating the victim.

The trial court addressed the admissibility of this evidence in a hearing on the Defendant's motion *in limine* and found that this evidence was admissible and that the jury could determine the weight to give the evidence. We conclude that the Defendant has not shown the trial court abused its discretion in this regard.

In its brief, the State cites a Texas case directly on point. *Dossett v. State*, 216 S.W.3d 7, 25-26 (Tex. Ct. App. 2006). Reviewing the same issue, the Texas court held that a defendant's statement about his dreams were "probative of the defendant's intent to commit the charged offense and admissible." *Id.* at 26. It also rejected the defendant's argument that evidentiary rule 403 should prohibit this evidence's admission. *Id.* We similarly hold. The Defendant's statements herein included an admission against interest, giving the statements probative value. The statements, which he made consistently to two separate witnesses on two separate occasions, included details about the crime, such as that it was committed with a hammer, and also that the Defendant became the assailant at some point in time. It also included that the victim whispered to the Defendant that she forgave him. The trial court did not err when it determined that the probative value of this evidence is not substantially outweighed by its unfairly prejudicial effect.

## 2. Police Interview

The Defendant next contends that the trial court erred when it allowed unredacted portions of his interview with police in which he discussed having been trained by the military to be a "killer." The State contends that the trial court properly exercised its discretion in this regard.

The trial court denied the Defendant's objection to the admissibility of this statement finding that the Defendant's reference to military service was just a statement of who he was and was not prejudicial. We agree with the trial court. The Defendant discussed during the statement of his military training that he had been taught to kill someone using a "Garrote knot." The victim in this case was found strangled and tied with a series of knots. This evidence was relevant and its probative value was not outweighed by its prejudice.

## 3. Ms. Ramsey's Knot Testimony

The Defendant next contends that the trial court erred when it allowed Ms. Ramsey to testify that she had seen the Defendant tie knots similar to the ones used to tie the victim. He asserts that this evidence was not relevant to his identity as the perpetrator and that any probative value is outweighed by its prejudicial effect. The State counters that the Defendant waived this issue and also that the trial court properly allowed this evidence.

The record clearly evinces that the trial court did not err when it allowed this testimony. Ms. Ramsey, who in a jury out hearing established her knowledge of and experience with the Defendant's knot tying abilities, testified before the jury that she had seen the Defendant tie knots similar to the ones used to bind the victim. This evidence is relevant to the Defendant's identity. Further, its probative value is not substantially outweighed by its unfairly prejudicial effect.

### E. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction for first degree premeditated murder because it is not based on direct evidence of his guilt. The State counters that the evidence supports the jury's verdict. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence

and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2014). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2014). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2014).

In the case under submission, we conclude that the evidence is sufficient to sustain the Defendant's conviction for first degree premeditated murder. The Defendant stated that, on the day of the victim's murder, he went to her house around 3:00 p.m. but no one was home. Immediately upon returning home, he washed his clothing and shoes, which behavior Ms. Singleton found highly unusual. She also found suspect his claim that he fell in the mud, as it had not been raining. The Defendant had on his person fresh wounds, including scrapes on his back, and what appeared to be blood on his arm. The Defendant's fingerprints were found at the crime scene and there was male DNA evidence found underneath the victim's fingernails that indicated that the Defendant could have been a contributor, and this evidence excluded 99% of the male population. Fibers consistent with the victim's clothing were found on the Defendant's clothing. The Defendant, who said he had been trained to be a killer, had experience with knots similar to the ones tied on the victim. He had a dream in which he was the victim's assailant and hit her in the head with a hammer and she offered him forgiveness. The Defendant laughed when Ms. Singleton told him that the police had confiscated her hammer because officers had taken her hammer and not his.

This evidence is sufficient for a rational jury to conclude that the Defendant used his knowledge of knots to tie the victim and then beat her in the head with his hammer. Thereafter, having bloodied his clothing and shoes, returned to his house and washed his attire to conceal his crime. The Defendant is not entitled to relief on this issue.

### F.  Cumulative Error

Lastly, the Defendant contends that he is entitled to a new trial based upon the

cumulative effect of the errors. The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial. *See State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) (citations omitted). To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings. *Id.* (citations omitted). Having concluded herein that there were no actual errors in the proceedings, this doctrine does not apply.

## III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

71